[No. A071676. First Dist., Div. Four. Aug. 29, 1996.]

SOFTWARE DESIGN AND APPLICATION, LTD., et al., Plaintiffs and Appellants, v.
HOEFER & ARNETT, INC., et al., Defendants and Respondents.

COUNSEL

Raifman & Edwards, Jon Logan Edwards and Liesel Brand Stevens for Plaintiffs and Appellants.

Allen E. Broussard, Jonathan R. Bass, Susan K. Jamison, Robert J. Stumpf, Claudia R. Carrington and David W. Studley for Defendants and Respondents.

OPINION

**ANDERSON, P. J.**—This is an appeal from judgments of dismissal after the court sustained demurrers and appellants[1] declined to amend. Although they were strangers to, not customers of, the respondent banks and brokerage firms,[2] appellants attempted to recover from them on several theories, including negligence and conversion. The real culprit, appellants' faithless financial consultant entrusted with a valuable portfolio, liquidated the assets with the help of his sister through an ingenious scheme involving a series of fictitious accounts. The trial court correctly concluded there was no liability under the pleadings and, accordingly, we affirm the judgments.

## I. FACTUAL BACKGROUND

On appeal we treat the demurrer as admitting all properly pleaded material facts and consider matters which may be judicially noticed. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Stanton Road Associates* v. *Pacific Employers Ins. Co.* (1995) 36 Cal.App.4th 333, 340 [43 Cal.Rptr.2d 1].) We thus turn to the complaint for the factual contour, as follows: Appellant Manu Chatterjee is founder and sole owner of SDA, a Hong Kong corporation. In 1991 Chatterjee hired Patrick McDonald (McDonald), a financial consultant, to manage his and SDA's investments.

McDonald immediately opened brokerage accounts with two securities brokerage firms: Hoefer & Arnett and Security Research. Rather than putting the accounts in the name of SDA, the foreign corporation, McDonald opened them in the name of a limited partnership, also called "Software Design & Application, Ltd." The partnership does not exist. McDonald presented

---

[1]Appellants herein are Software Design and Application, Ltd., a Hong Kong corporation (SDA) and Manu Chatterjee.

[2]Respondents herein are Hoefer & Arnett, Inc. (Hoefer & Arnett), Wells Fargo Bank (Wells Fargo), First Interstate Bank of California (First Interstate) and Security Research Associates, Inc. (Security Research).

falsified papers identifying himself as general partner of this fictitious partnership and SDA as one of its limited partners, and designating himself as sole signatory on both accounts. In opening the accounts, he did not present documentation showing that SDA was, indeed, a limited partner or had authorized him to transact business.

Chatterjee had no knowledge that McDonald took these actions and never authorized him to open accounts in the name of a limited partnership or name himself as sole signatory on any SDA account. In 1993 Chatterjee, with McDonald's encouragement, transferred his Paine-Webber portfolio to the Hoeffer & Arnett account. Paine-Webber documentation provided to Hoeffer & Arnett, at the time of the transfer, indicated the securities and funds were owned and controlled by Chatterjee.

McDonald never gave Chatterjee any reports on either accounts, and had monthly account statements sent to a post office box, falsely representing it as an office address.

Meanwhile, in September 1992, McDonald's sister, Linda McDonald, opened an account at Wells Fargo in the name of the fictitious limited partnership with herself as sole signatory. She was not identified as a partner or agent of the general partner and did not then have a valid California driver's license.

The customer representative handling the transaction knew Linda Mc-Donald—she was a bookkeeper for a San Francisco law firm that was itself a Wells Fargo customer. The complaint also alleges that prior to opening the accounts for the fictitious partnership, Linda McDonald had opened several other Wells Fargo accounts for different entities, always designating herself as sole signatory, and representing that she held various positions with these companies, including that of president.

Linda McDonald also opened an account in the name of the fictitious limited partnership at First Interstate, identifying herself and Christine Tanner as the signatories; neither "were identified on the false partnership form." The complaint further alleges that Linda had opened other accounts with First Interstate under various entities, representing that she held various positions

Beginning in March 1992 and continuing over the course of two years, McDonald systematically sacked the brokerage accounts. A total of $1,169,050 was transferred from the Hoeffer & Arnett account to the First Interstate and Wells Fargo accounts, and $429,420 was directed from the

Security Research account to unknown locations, all without appellants' knowledge, consent or authorization.

Linda McDonald withdrew approximately $746,310 of appellants' funds from the Wells Fargo account during the period June 1993 through March 1994, directing these funds to various other Wells Fargo accounts she had opened. Beginning in April 1992 and continuing for a period of years, Linda McDonald and Tanner withdrew an "unknown" amount of appellants' funds from the First Interstate account.

Around September of 1993, McDonald ceased responding to calls or inquiries from Chatterjee. The following month Chatterjee tried without success to reach McDonald. When Chatterjee then attempted to sell stock from the Hoeffer & Arnett account, he discovered the firm had no knowledge of his interest in the account and that McDonald had wired funds to a Wells Fargo account.

From these alleged facts appellants attempted to state causes of action against all respondents for negligence, conversion and violation of California Uniform Commercial Code[3] section 11204. The court sustained demurrers to the first amended complaint and then dismissed after appellants failed to further amend. This appeal followed.

## II.  DISCUSSION

### A.  *Appellants Cannot State a Cause of Action for Negligence*

■    The existence of a duty of care toward an interest of another worthy of legal protection is the essential prerequisite to a negligence cause of action, determined as a matter of law by the court. (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].) ■    The gist of appellants' negligence claim is that the banks and brokerage firms owed a duty of care to Chatterjee and SDA to investigate the entity opening the account and to thereafter supervise and monitor account transactions such as withdrawals and transfers. Respondents successfully demurred on the ground that they did not owe appellants any duty of care.

The primary flaw in appellants' negligence theory is that none of the respondents had any relationship with Chatterjee or SDA. Appellants are not customers or past customers of the banks or the brokerage firms. They are, therefore, strangers to the contractual relationships between respondents and

---

[3]All further statutory references are to the California Uniform Commercial Code.

the thieves. We now analyze the duty issue, in its various permutations, against this fact.

### (1)  *Banks*

In this case the banks' basic duty of care derives from the contract with their customer, account holder Linda McDonald. Chatterjee knew nothing of her bank accounts, and was not a customer of either bank; neither was SDA. Recent cases have held that absent extraordinary and specific facts, a bank does not owe a duty of care to a noncustomer. (*Dodd* v. *Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1628 [272 Cal.Rptr. 623] [no showing that noncustomer was alter ego of, or had personally guaranteed debts of, bank's customer]; *Roy Supply, Inc.* v. *Wells Fargo Bank* (1995) 39 Cal.App.4th 1051, 1076 [46 Cal.Rptr.2d 309] [no duty to corporate president not a party to corporate account, nor an intended beneficiary thereof].)

### (a)  *No Duty With Respect to the Transfer of Funds Into the Bank Accounts*

Nevertheless, appellants posit such a duty, based primarily on *Sun 'n Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920] and its progeny.[4] In *Sun 'n Sand*, our Supreme Court held that a bank owes a limited duty of inquiry when a check presented for deposit bears some objective signs of fraud. There, the plaintiff, at an employee's urging, made checks payable to defendant bank, believing it owed the bank minor sums. The employee altered the checks to increase the sums, then deposited them in her personal account with the same bank. The bank permitted this negotiation without any inquiry, despite the fact that the checks were not payable to the employee, but to the bank itself.

Our Supreme Court first reiterated the competing policy considerations that come into play when deciding to impose a duty to exercise reasonable care under a given set of circumstances. These include " '. . . the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." (*Sun 'n Sand, Inc.* v. *United*

---

[4]See *E.F. Hutton & Co.* v. *City National Bank* (1983) 149 Cal.App.3d 60 [196 Cal.Rptr. 614], *Joffe* v. *United California Bank* (1983) 141 Cal.App.3d 541 [190 Cal.Rptr. 443], and *Sehremelis* v. *Farmers & Merchants Bank* (1992) 6 Cal.App.4th 767 [7 Cal.Rptr.2d 903].

*California Bank, supra,* 21 Cal.3d at p. 695, quoting *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

The court went on to conclude: "[A]n attempt by a third party to divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation. Accordingly, we conclude that Sun 'n Sand's allegations define circumstances sufficiently suspicious that [the bank] should have been alerted to the risk that Sun 'n Sand's employee was perpetrating a fraud. By making reasonable inquiries, [the bank] could have discovered the fraudulent scheme and prevented its success." (*Sun 'n Sand, Inc.* v. *United California Bank, supra,* 21 Cal.3d at pp. 694-695.) However, the court also cautioned that this "duty is narrowly circumscribed: It is activated only when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit. Moreover, the bank's obligation is minimal. We hold simply that the bank may not ignore the danger signals inherent in such an attempted negotiation. There must be some objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed." (*Id.,* at pp. 695-696.)

Post-*Sun 'n Sand* cases involve similar situations. For example, in *Joffe* the reviewing court found sufficiently suspicious circumstances where the check was for a substantial amount, payable to an escrow account at another bank, and lacked adequate indicia as to who was authorized to negotiate the instrument. (*Joffe* v. *United California Bank, supra,* 141 Cal.App.3d at p. 556.) Similarly, in *E.F. Hutton* the employee forged endorsements on checks payable to various payees and deposited them into his personal account. The reviewing court concluded there was a duty of inquiry to the maker of the checks because the checks, either individually or in an aggregate amount, were for a substantial amount and there was inadequate indicia that the customer was authorized to negotiate them. (*E.F. Hutton & Co.* v. *City National Bank, supra,* 149 Cal.App.3d at pp. 67-68.) Finally, *Sehremelis* has to do with whether the duty of inquiry extended to the particular plaintiffs. There, endorsements on checks presented for deposit were either forged, unauthorized or nonexistent. Although plaintiffs were not the drawers of the checks, the court nonetheless ruled there was a duty because the checks were drawn on their loan accounts, on their behalf. (*Sehremelis* v. *Farmers & Merchants Bank of Long Beach, supra,* 6 Cal.App.4th at p. 775.)

The danger signals triggered in these cases all stemmed from the particular circumstances of the checks, endorsements or depositors, where the

person attempting to negotiate the check is not the payee. Here, no checks were presented to either bank for deposit. Rather, funds were deposited into the precise accounts to which they were directed by wire transfer. The accounts at the banks were the identified and intended destination of funds wired from the brokerage accounts by McDonald. SDA was not an originator of the wire transfers, played no role in the transactions, and was not identified as possessing any interest in the funds transferred into the bank accounts. In short, there was nothing suspicious as to the wiring of funds into the Wells Fargo and First Interstate accounts and, thus, SDA was not a foreseeable and identifiable injured third party.

### (b)  *No Duty With Respect to Withdrawal of Funds*

Appellants suggest that the frequency with which the McDonalds "deposited and simultaneously withdrew hundreds of thousands of dollars from the Phony LP accounts was a sharp indicator of money laundering or other illegal activity." They cite no authority for the proposition that, in the absence of suspicious *instruments*, a bank has a duty to supervise account activity or otherwise track frequent and/or large dollar transactions in deposit accounts, nor are we aware of any such duty.

Moreover, with respect to the withdrawals from the Wells Fargo and First Interstate accounts, there were no extraordinary and specific facts which would give rise to liability to a noncustomer for mishandling the accounts by honoring customer withdrawals. Banks had no knowledge of SDA's ownership interest in the funds, nor do appellants allege any such knowledge or facts pointing to constructive knowledge.

### (c)  *No Duty With Respect to Opening the Accounts*

Appellants' real complaint is that the banks did not follow their own internal policies or standard industry practices pertaining to verifying authorization of an individual to open a partnership account,[5] and ignored suspicious circumstances surrounding the establishment of those accounts. From this they assert that the banks breached a duty of care owed to SDA upon opening the accounts for Linda McDonald.

First, appellants have at least part of their argument backward. They claim that failure to follow internal procedures and industry standards when opening an account, such as requiring documentation to verify the existence of

---

[5]The complaint alludes to various investigative tasks that could have been, but were not, performed to verify the partnership's bona fides, including obtaining a copy of the limited partnership agreement or certificate of limited partnership, or checking with the Secretary of State to confirm the existence of the partnership.

the partnership, was negligent. However, absent a duty, the defendant's care, or lack of care, is irrelevant. Violation of a self-imposed rule does not create actionable negligence unless plaintiff (1) suffers the type of harm sought to be prevented by the rule and (2) is a member of the class of people for whose protection the rule was promulgated. (*Fireman's Fund Ins. Co.* v. *Security Pacific Nat. Bank* (1978) 85 Cal.App.3d 797, 829 [149 Cal.Rptr. 883].) Appellants make the conclusory statement that these practices are an industry safeguard "against the sort of misconduct perpetrated by McDonald." However, they did not allege, nor can they, that any such account opening or screening procedures exist to *protect strangers with whom they do no business.* Rather, they exist to protect the banks.[6]

Second, contrary to appellants' assertions, the circumstances surrounding the opening of the accounts were not so suspicious as to trigger a duty to investigate the phony partnership for the benefit of strangers. Again, nothing in the account opening process would hint that SDA existed. Further, that Linda McDonald had opened other corporate and partnership accounts, with herself as sole signator, is not on its face illegal and had that fact triggered investigation, again it would be for the banks' benefit, not for noncustomers. The same can be said for the fact that although Linda McDonald and Tanner were signators, they were not identified as partners or agents of the phony limited partnership. With respect to Wells Fargo, that the customer representative knew Linda McDonald as bookkeeper for one of its law firm customers does not make her behavior any more suspicious as to the rights of third party strangers.

Finally, determination of whether to impose a duty of inquiry under the circumstances at hand fails the *Rowland* v. *Christian* analysis. To begin, it is within the realm of possibility and, hence, foreseeable on some level that a prospective account holder might present phony corporate or partnership papers to open an account and then use the account to fraudulent ends. However, nothing in these transactions gave any inkling that SDA or anyone else was a potential victim and, hence, foreseeability becomes a very abstract and rarefied concern. ■ "[C]reation of a legal duty requires more than a mere possibility of occurrence since, through hindsight, everything is foreseeable." (*Hegyes* v. *Unjian Enterprises, Inc.* (1991) 234 Cal.App.3d 1103, 1133 [286 Cal.Rptr. 85].) Moreover, foreseeability of harm or knowledge of danger, by itself, is insufficient to create a legally cognizable special relationship giving rise to a duty to prevent harm. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 297 [253 Cal.Rptr. 97, 763 P.2d 948].)

---

[6]The same allegations are made with respect to Hoefer & Arnett and Security Research, and the same analysis applies.

■ Second, while appellants unequivocally allege they suffered injury, the relationship between the banks' alleged malfeasance and the harm they suffered is tenuous. This is because prior to opening the accounts at Wells Fargo and First Interstate, McDonald had *already stolen money and securities from SDA and Chatterjee,* having wrested control of these funds by placing them in bogus accounts with the brokerage firms. Third, the real villains deserving of moral blame are the McDonalds, not the banks. And finally, the burden on banks, if we were to recognize a duty of inquiry and detection in the circumstances of appellants' complaint, is out of proportion to the potential harm averted by such a result. Scrutiny into the financial and business affairs of prospective customers for the express purpose of ferreting out the faithless fiduciary and divining illegal conduits for embezzled funds would be intrusive for the citizenry and add to the cost of financial transactions, both in terms of time and money. Better that the one contemplating the services of a financial advisor do the background check and then monitor the services rendered. It is that person who has the most control and the most to win or lose, and with whom the investigative tasks should rest.

### (2)  *Brokerage Firms*

■ Appellants likewise pronounce that Hoefer & Arnett and Security Research *owed them* duties to take reasonable steps to (1) verify the authority of individuals purporting to act in the name of a business entity when opening a brokerage account, and (2) then monitor the wiring of funds therefrom. They cannot establish any such duty.

First, *Sun 'n Sand* and the related authority upon which appellants rely pertain to the duties of *banks* in the *negotiation of checks.* Second, to the extent these cases bear at all on the potential liability of a brokerage firm to a noncustomer, they call for "sufficiently suspicious" circumstances to place the firms on inquiry notice that their customer is committing fraud. The circumstances alleged in the complaint do not, as a matter of law, amount to red flags that should have alerted the securities brokers to potential fraud.

The first allegation has to do with "repeated withdrawal or transfer of funds in large quantities" from the brokerage accounts, "often in rapid succession," which activity was "suspicious evidence of illegal or fraudulent activity" in the accounts. This is almost too absurd to address. The withdrawals and transfers were made pursuant to the instructions of McDonald, their customer and signatory on the accounts. Account activity, whether in large sums or small, whether frequent or infrequent, is the nature of the beast—far from being suspicious, it is expected, routine behavior.

The next allegation is that no "official documents, such as articles, bylaws or certificate of limited partnership" were presented to the brokerage firms to establish the *bona fides* of the account holder. If the brokerage firms did not *ask for* the documentation, what cause is there to become suspicious just because the applicant does not volunteer it? And, to the extent appellants argue that the firms would have discovered McDonald's fraud had they affirmatively investigated the bogus partnership, this assertion merely begs the duty question—none exists absent suspicious circumstances, and the circumstances here did not wave any red flags to trigger the duty.

Finally, appellants averred that certain documentation from Paine-Webber accompanied the transfer of Chatterjee's Paine-Webber portfolio to Hoefer & Arnett which "indicated that the securities and funds being transferred were owned and controlled exclusively" by him. In his amended complaint, Chatterjee fails to include a description of this documentation or to append copies thereof, as he did in his initial complaint.[7] That pleading stated that "documentation included a letter signed by Mr. Chatterjee" as well as "a transfer request form" signed by him, true copies of which were attached as exhibits to the complaint. Those documents were not at all questionable or irregular on their face. Both were signed by Chatterjee. They authorized the transfer of the SDA account at Paine-Webber to Hoefer & Arnett, and identified the Hoeffer & Arnett account number, plus "n/o: Software Design & Applications, Ltd." Remember, SDA was supposedly a limited partner of the bogus partnership "Software Design & Application, Ltd."

Appellants cannot retreat from these allegations and supporting exhibits concerning *actual* documentation and supplant them in amended pleadings with conclusory allegations characterizing documentation in *general terms*, and with an entirely different twist. ■ "Where a complaint contains allegations destructive of a cause of action the defect cannot be cured by their omission without explanation in a subsequent pleading. [Citation.] For purposes of a demurrer to an amended pleading an unexplained suppression of the original destructive allegation will not, in the words of Lady MacBeth, wash out the 'damned spot.'" (*Blain* v. *Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1058 [272 Cal.Rptr. 250].) Moreover, allegations in a complaint must yield to contrary facts found in exhibits to the complaint. (*Dodd* v. *Citizens Bank of Costa Mesa, supra*, 222 Cal.App.3d at p. 1627.)

---

[7]The court below properly read the amended complaint as "referring back to these original documents" and asked appellants if there was something else which they claimed formed part of the documentation which should have put Hoefer & Arnett on notice that things were amiss. Later, counsel for appellants requested leave to amend, stating, "we have received some documents" and "perhaps" there are additional facts, committing not to amend if none existed. The court granted leave but no further amendments followed.

## B. *Appellants Cannot State a Cause of Action for Conversion*

■ Appellants also assert a claim for conversion under section 3420.[8] This statute does not apply because it governs conversion of negotiable instruments, not money or securities.[9] The complaint describes funds coming into the brokerage accounts as "securities" and "money" and funds going out of these to the banks as money transferred by wire transfer. No instruments were involved.

Moreover, there could be no conversion as to checks which Linda McDonald signed to withdraw funds from the Wells Fargo and First Interstate accounts because SDA is not a proper plaintiff. An action under section 3420 may not be brought by a payee who does "not receive delivery of the instrument either directly or through delivery to an agent or a copayee." (§ 3420, subd. (a).) There can be no conversion action until the check is delivered to the payee because until delivery, the payee is not a holder and has no property interest in the check. Appellants have not alleged—nor can they—that SDA was a "payee" of any instrument and, therefore, their section 3420 claim fails.

Finally, appellants cannot state a common law count for conversion of money. Conversion is any act of dominion wrongfully exerted over the personal property of another. (*Gruber* v. *Pacific States Sav. & Loan Co.* (1939) 13 Cal.2d 144, 148 [88 P.2d 137].) However, money cannot be the subject of a conversion action unless a specific sum capable of identification is involved. (*Haigler* v. *Donnelly* (1941) 18 Cal.2d 674, 681 [117 P.2d 331].) As to the banks there are no allegations that as money in varying amounts was wired into the accounts, it was held in escrow or in some otherwise segregated fund for the benefit of SDA. Rather, it came into the partnership accounts over time, in various sums, without any indication that it was held in trust for SDA. And, as to the brokers, they were bailees acting in good faith on instructions of their customer. ■ A bailee who receives bailed property from a thief, without notice of the true owner's claim and returns the property to the bailor according to the terms of the bailment, is not liable for conversion. (*Steele* v. *Marsicano* (1894) 102 Cal. 666, 669 [36 P. 920].)

---

[8] It provides, in part: "An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment." (§ 3420, subd. (a).)

[9] Section 3420 is part of division 3 of the California Uniform Commercial Code entitled "Negotiable Instruments." Division 3 specifically *applies* to negotiable instruments and *does not apply* to money or securities. (§ 3102, subd. (a).) The term "instrument" is defined as a shorthand synonym for "negotiable instrument" (§ 3104, subd. (b)).

## C. *There Is No Cause of Action Under Section 11204*

█ Appellants also claim the benefit of section 11204 which obligates a receiving bank to refund its customer's account for unauthorized payment orders.[10] In the case of the brokerage firms, there is no liability because they are not banks, let alone receiving banks. Further, appellants were not customers, as defined in section 11105, of either the banks or the brokerage firms. Therefore, their section 11204 cause must fail.

The judgment is affirmed.

Poché, J., and Hanlon, J., concurred.

---

[10]The following definitions are pertinent: A "bank" is "a person engaged in the business of banking and includes a savings bank, savings and loan association, credit union, and trust company." (§ 11105, subd. (a)(2).) A "customer" is "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders." (§ 11105, subd. (a)(3).) A "payment order" is "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary" provided certain defined conditions are met. (§ 11103, subd. (a)(1).) A "receiving bank" is "the bank to which the sender's instruction is addressed." (§ 11103, subd. (a)(4).) The "sender" is "the person giving the instruction to the receiving bank." (§ 11103, subd. (a)(5).)