[No. B113910. Second Dist., Div. Five. Nov. 18, 1998.]

KAREN KANE, INC., Plantiff and Appellant, v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS
ASSOCIATION, INC., et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

## COUNSEL

Fenigstein & Kaufman, Harold J. Tomin, Dolman & Samuels, and S. Zachary Samuels for Plaintiff and Appellant.

Gabriel Colorado, John C. Fauvre, Ullar Vitsut, James N. Roethe, Pierce & Gorman, Patrick J. Gorman, Randy A. Berg and Susan S. Park for Defendants and Respondents.

## OPINION

**ARMSTRONG, J.**—As the result of the wrongful activities of a scheming employee, appellant Karen Kane, Inc., wrote over seventy-six checks over a period of two or three years, totaling approximately $760,000, for merchandise which it never received.[1] The checks were printed, unaltered checks which bore genuine signatures and were deliberately issued by Karen Kane in what appeared to even Karen Kane to be the regular course of business.

---

[1] On this review of judgment entered after a demurrer was granted without leave to amend, we assume the truth of all properly pleaded material allegations of the complaint. (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].)

The checks were cashed at a check cashing service called Soto Check Cashing and were deposited by Soto into its account at the Bank of America National Trust and Savings Association, Inc. There is no claim that the checks or endorsements were forged, or that funds were paid to other than the payees selected by Karen Kane, albeit selected as the result of internal fraud.

Karen Kane sued Soto[2] and the Bank for negligence, alleging that the checks bore indicia of wrongdoing, such as unconventional endorsements and unbusinesslike negotiation for cash at a check cashing service. Karen Kane claims that these circumstances gave respondents notice that it was probable that Karen Kane had unwittingly issued the checks as the result of an unlawful scheme, made harm to Karen Kane foreseeable by both Soto and the Bank, and created a duty to inquire of Karen Kane as to the validity of the obligation supporting the checks.[3] Karen Kane argues that this duty arose under general principles of negligence law, as explicated in *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920] and its progeny.

It is at the heart of this case that the loss Karen Kane has suffered concerns not the validity of the endorsements or the negotiation of the checks, but the circumstances which caused Karen Kane to write the checks. We conclude that the facts alleged did not create a duty on either Soto or the Bank to inquire of the maker if a valid transaction supported the checks, before accepting the checks. Consequently, the trial court did not abuse its discretion in sustaining respondents' demurrers without leave to amend, and we affirm the judgment.

### The Second Amended Complaint

Karen Kane is a manufacturer of women's clothing. Norman Dantzler was manager of Karen Kane's trim department. His duties included approval of orders to outside vendors for such things as buttons and ribbon. In 1992, Dantzler and button vendors Danny and Ratana Wong agreed that Dantzler could repay a debt by having Karen Kane place an order for more buttons than Karen Kane needed. The Wongs would ship a lesser number, the shipment would be approved by Dantzler, and Dantzler would see to it that the full amount was paid.

---

[2]More precisely, Karen Kane sued Young Bun Im and Jung Sook Im, alleged to have been doing business as Soto Check Cashing Service, and the Soto Check Cashing Service, referred to collectively herein as Soto. Karen Kane also sued numerous individuals and businesses that were alleged to have been part of the scheme.

[3]Karen Kane also brought causes of action against Soto titled: aiding and abetting conversion, conspiracy to convert, money had and received, and constructive trust. In the unpublished portion of this opinion, we find that demurrer was correctly sustained as to each of those causes of action.

In late 1992 or early 1993, Dantzler and the Wongs escalated their scheme from "short shipment" to "no shipment." Dantzler would cause Karen Kane to issue purchase orders to various fictitious companies. Karen Kane would receive no merchandise, but Dantzler would arrange for Karen Kane's accounts payable department to issue checks in the amount of the invoices. Karen Kane alleged that it did not discover the scheme until May of 1996, and that it could not have done so with the exercise of reasonable care.

Between late 1993 and May of 1996, Karen Kane issued at least 76 checks, totaling $760,000, to 6 fictitious payees. Most of the checks were in amounts between $7,000 and $13,000, although one was for over $22,000. Soto cashed the checks, and in some instances wire-transferred the proceeds to banks in Thailand or other overseas locations. Soto deposited the checks in its account at the Bank. The Bank presented the checks to Karen Kane's bank, which is not a party here, for collection and payment. Karen Kane's bank paid the checks and charged Karen Kane's account.

Karen Kane alleged that the endorsements on each of the checks exhibited multiple danger signals and indicia of wrongdoing which should have alerted the Bank and Soto to the possibility that the checks were part of a scheme to defraud Karen Kane. Specifically, the checks contained two handwritten endorsements, either the payee company's name with an individual's name below it, or an individual's name with the payee company's name below it. Karen Kane alleged that these endorsements were suspicious because they did not allow the Bank or Soto to ascertain whether the individual endorser had any relationship to the payee or whether the person negotiating the check was authorized by the payee to do so. Further, none of the checks had an endorsement guarantee, none of the checks contained a co-officer's endorsement, and none of the checks had an endorsement stamp, all contrary to what was alleged to be standard business practice in legitimate commercial transactions. The facts that the checks were frequent, were individually and in the aggregate in large amounts, and were negotiated for cash at a check cashing service were alleged to be additional danger signals and indicia of wrongdoing, since large checks made out to business entities are allegedly not normally negotiated for cash. Further, on several occasions, two or three checks were accepted by the Bank for deposit on a single day.

Karen Kane also alleged that each check was in excess of the teller limit at the Bank and could not be deposited until reviewed by a senior teller or supervisor, that the banking industry knew that check cashing services such as Soto were high-risk customers which were often the focus of fraudulent or criminal activity, and that the Bank opened accounts for check cashing services only after assuring itself that it was charging fees high enough to offset the known risk.

In addition, Karen Kane alleged that respondents failed to comply with federal laws which require reports to the Treasury Department of suspicious transactions involving $5,000 or more, and currency transactions of $10,000.

Respondents demurred to the second amended complaint on the grounds, inter alia, that they had no duty to Karen Kane. The trial court sustained the demurrers without leave to amend and dismissed the case as to respondents.

## Discussion

### I. *Negligence*

■■■ "The existence of a duty of care toward an interest of another worthy of legal protection is the essential prerequisite to a negligence cause of action . . . ." (*Software Design & Application, Ltd.* v. *Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 478 [56 Cal.Rptr.2d 756].) " ' "Duty" is merely a conclusory expression used when the sum total of policy considerations lead a court to say that the particular plaintiff is entitled to protection.' [Citation.] Duty is an allocation of risk determined by balancing the foreseeability of harm, in light of all of the circumstances, against the burden to be imposed." (*White* v. *Southern Cal. Edison Co.* (1994) 25 Cal.App.4th 442, 447 [30 Cal.Rptr.2d 431].)

■■■ Karen Kane contends that duty is established under the traditional negligence analysis set forth in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], and that such cases as *Sun 'n Sand, Inc.* v. *United California Bank, supra,* 21 Cal.3d 671 further establish the Bank's duty.

■■■ *Rowland* v. *Christian, supra,* 69 Cal.2d 108, *supra,* sets forth some of the factors that courts consider in determining the existence of a duty in a particular case. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 675, fn. 5 [25 Cal.Rptr.2d 137, 863 P.2d 207].) Those factors are the foreseeability of harm to the plaintiff, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care, and the availability, cost, and prevalence of insurance for the risk involved. (*Rowland* v. *Christian, supra,* 69 Cal.2d at p. 113.)

■■■ Karen Kane alleges that several indicia made the harm foreseeable. Those indicia were that the checks were frequent, were in large amounts,

bore unbusinesslike and unorthodox endorsements which departed from standard business practice, and were negotiated for cash at a check cashing service.

There are several problems with this argument. First, we do not believe that volume or amount of the checks was sufficient to inform respondents of the possibility of improper activity at Karen Kane. The checks were business-to-business checks, were regular on their face, and were cashed over a period of several years. Karen Kane, as the maker of the checks, had firsthand knowledge of the amount and frequency of the checks. Yet, Karen Kane alleged that this knowledge did not enable it to discover the scheme earlier than it did. It is difficult to see how the amount or frequency of the checks could constitute notice of possible fraud to Soto and the Bank, but not to Karen Kane, the maker of the checks.

We next consider the argument that the endorsements were an indicia of wrongdoing. Karen Kane alleges that the endorsements were unorthodox in that they did not involve use of an endorsement stamp or include an endorsement guarantee, and included two handwritten endorsements, either the payee company's name with an individual's name below it, or an individual's name with the payee company's name below it.

This is not a case where a payee claims that as a result of a forged or improper endorsement it did not receive the proceeds of a check. Even if the endorsements were indeed unorthodox, they were made on behalf of the payee and the payee received the check proceeds, just as Karen Kane intended when it signed and delivered the checks. Karen Kane does not furnish any legal authority which establishes a specific method or formula to be followed when an individual endorses for a business payee, and we are not aware of a legal requirement that a business payee use an endorsement stamp.

Further, the unconventional or unorthodox aspects of the endorsements do not logically suggest internal fraud at Karen Kane. An endorsement stamp is used for the convenience of a payee, not the check maker. The lack of a stamp or an unorthodox company endorsement might indicate something about the payee, or even suggest that the endorser is not the payee, but we fail to see how such facts would indicate that the maker is being defrauded. Similarly, in other circumstances a problematic endorsement might indicate that a check had been stolen from the maker or the payee, that the maker's signature was forged, that a thief had substituted the name of a different payee for the payee selected by the check's maker, or that an endorsement was forged, or that the payee was in some other way being defrauded. None

of those things are alleged to have taken place here. According to the allegations of the complaint, the checks were genuine in all particulars, the endorsers were authorized by the payees to endorse, and the funds were paid to the payees designated by Karen Kane. We do not believe that the cited indicia concerning endorsements was a red flag which should have alerted respondents, or any bank or check cashing service in respondents' shoes, to the possibility of internal fraud at Karen Kane.

Further, even if the cited indicia made foreseeable the possibility that Karen Kane was being defrauded, foreseeability is not the only factor to be considered in a duty analysis. *Rowland* instructs us to examine the burden which would be imposed on the defendant and the consequences to the community if a duty was found. Here, a considerable burden would be imposed on check cashing services, banks, and their customers if we were to find that those institutions had to inquire into the activities of both the makers and payees of checks regarding the possibility of internal fraud, and the flow of commerce would be substantially impeded. (Cf. *Sun 'n Sand, Inc.* v. *United California Bank, supra,* 21 Cal.3d 671.) Karen Kane argues that the burden is slight, since a simple telephone call from Soto or the Bank to a responsible person at Karen Kane, such as the person who signed the checks, would have averted the harm. We cannot agree. Nothing in the complaint indicates that such a telephone call would have been other than futile. The checks were issued and signed by Karen Kane in the ordinary course of business, supported by invoices and shipping documents which are not alleged to have borne indicia of fraud. A telephone call from the Bank or Soto would have unearthed no information not contained on the first check which was part of the scheme, and which was honored by Karen Kane's bank.

Karen Kane had the ability to police its own financial practices, to take steps to avoid being victimized by its employees, and to obtain insurance against the acts of faithless employees. "It is that person who has the most control and the most to win or lose . . . with whom the investigative tasks should rest." (*Software Design & Application, Ltd.* v. *Hoefer & Arnett, Inc., supra,* 49 Cal.App.4th at p. 483.) Nothing in the complaint suggests that Soto or the Bank interfered with Karen Kane's relationship with its own bank or its access to its canceled checks, and thus its ability to examine the endorsements, draw the conclusions it now finds implicit in those endorsements, and put an end to the scheme. Further, Karen Kane was not the Bank's customer, and neither the Bank nor Soto had any preexisting relationship with Karen Kane which would have given it an opportunity to learn its business, or establish a connection with its personnel or its financial practices. (See *Software Design & Application, Ltd.* v. *Hoefer & Arnett, Inc., supra,* at p. 481.)

The *Rowland* factor concerning the closeness of the connection between the defendant's conduct and the injury suffered also suggests that there is no duty here. Under the allegations of the complaint, Karen Kane suffered harm at the hands of Dantzler and the Wongs, not respondents. Similarly, there is no moral blame attached to respondents' behavior. Instead, the villains in the story set out in the complaint are Dantzler, the Wongs, and the other individual defendants. And, given the sophistication of the scheme which victimized Karen Kane, it is unlikely that imposition of a duty of inquiry on institutions such as respondents would prevent future harm. Scoundrels who can defraud their own employers will no doubt also find means to deflect investigatory telephone calls from collecting banks and check cashing services.

Thus, the *Rowland* factors, individually and collectively, indicate that neither Soto nor the Bank had the duty of inquiry Karen Kane suggests. We find nothing to the contrary in *Sun 'n Sand, Inc.* v. *United California Bank, supra,* 21 Cal.3d 671, or the other cases cited by Karen Kane.

*Sun 'n Sand* applied the *Rowland* factors in the context of a bank's duty to the maker of a check. In that case, an employee whose duties included the preparation of checks for signature by a corporate officer prepared a number of small checks payable to the defendant bank. The corporate officer signed the checks, believing that the corporation owed the bank those amounts. The employee altered the checks to increase the amounts, then deposited them in her personal account at the same bank. The bank permitted this negotiation without any inquiry. The corporation sued the bank for negligence, contending that the bank breached a duty of care by permitting the employee to deposit the checks into her own account, despite the fact that the bank was the payee. The Supreme Court held that "an attempt by a third party to divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation. Accordingly, we conclude that Sun 'n Sand's allegations define circumstances sufficiently suspicious that [the bank] should have been alerted to the risk that Sun 'n Sand's employee was perpetrating a fraud. By making reasonable inquiries, [the bank] could have discovered the fraudulent scheme and prevented its success." (21 Cal.3d at pp. 694-695.) The Supreme Court described the duty as one which is "narrowly circumscribed" and arises "when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit." (*Id.* at pp. 695-696.) Those facts are, of course, quite dissimilar to those before us here.

The post-*Sun 'n Sand* cases cited by Karen Kane involve facts similar to those in *Sun 'n Sand,* and are of no assistance to Karen Kane. In *Joffe* v.

*United California Bank* (1983) 141 Cal.App.3d 541 [190 Cal.Rptr. 443], the plaintiff caused its savings bank to issue a check to an investment company and the investment company's trust account at Wells Fargo Bank. The investment company did not deposit the check into the trust account named as a payee, but deposited it into its own account at another bank, the Bank of America. The plaintiff sued the Bank of America for negligence. The Court of Appeal found that the facts were sufficiently suspicious to fall under the *Sun 'n Sand* rule, holding that "Under these circumstances—a check for a substantial amount, payable to an escrow, or trust, or similar entity at another bank, with inadequate indicia on the face of the check regarding the representative authorized to negotiate the instrument—we conclude that the risk to the drawer is sufficiently foreseeable to impose a duty on a depositary bank 'not to ignore the danger signals inherent' in an attempted negotiation by a third party." (*Id.* at p. 556.)

Similarly, in *E.F. Hutton & Co.* v. *City National Bank* (1983) 149 Cal.App.3d 60 [196 Cal.Rptr. 614], an employee obtained 18 corporate checks payable to various payees. The employee forged the endorsements and deposited the checks into his personal account. The bank accepted the checks without any attempt to verify the endorsements or the employee's authority to deposit the checks into his own account. The reviewing court concluded that the collecting bank had a duty of inquiry to the maker of the checks, citing the facts that the checks were in substantial amounts and were payable to payees at another bank, and bore inadequate indicia that the employee was authorized to negotiate them. (*Id.* at p. 68.)

Unlike *Sun 'n Sand* and the other cited cases, there is no allegation here that the checks were altered, or bore forged endorsements, or that, having cashed the checks, Soto was not entitled to deposit them into its account at the Bank. In contrast, in *Sun 'n Sand*, the payee was the bank, but the checks were altered and the deposited into the faithless employee's personal account. Similarly, in *E.F. Hutton,* the endorsements were forged and the checks deposited into the forger's personal account. In *Joffe,* a check made payable to "Continental Financial Systems—Wells Fargo Escrow Account" was endorsed by Continental and deposited into a nonescrow account at another bank. These cases were recently and accurately summarized in *Software Design & Application, Ltd.* v. *Hoefer & Arnett, Inc., supra,* 49 Cal.App.4th 472, which stated that: "[t]he danger signals triggered in these cases all stemmed from the particular circumstances of the checks, endorsements or depositors, *where the person attempting to negotiate the check is not the payee.*" (*Id.* at pp. 480-481, italics added.) Those danger signs are not present here.

*Software Design* is itself relevant. There, the faithless employee opened a brokerage account in the name of a nonexistent partnership, with himself as

sole signatory. The employee transferred his employer's assets to the account, then looted the account by transferring money from it to bank accounts which were also in the name of the fictitious partnerships. The employer contended that the banks and brokerages owed it a duty of care to investigate the entity opening the accounts, and to supervise and monitor account transactions. The court found that no such duty existed, noting that the primary flaw in the employer's negligence theory was that the employer was a stranger to the banks and brokerage firm. (49 Cal.App.4th at pp. 481-483.) Here, as in *Software Design*, Karen Kane had no relationship with the Bank, and the Bank did nothing more than allow its customer, Soto, to deposit checks into its own account.

Karen Kane argues that this case is like *Sun 'n Sand* and subsequent cases because in this case, as in those cases, it was foreseeable from the unorthodox endorsements that the maker of the check would suffer harm. In the cases cited, the harm which could be foreseen was the harm caused by having funds paid to other than the payee. The essence of those cases is that various signs on the checks indicated that the person who sought to receive the proceeds was not the payee intended by the check's maker. Here, the checks were paid to the payees selected by Karen Kane. Karen Kane's contention is not that the endorsements should have indicated that there was something wrong with the checks or their negotiation, but that there was something wrong with the payees selected by Karen Kane.

The duty of inquiry described in *Sun 'n Sand* is "narrowly circumscribed." (*Sun 'n Sand, Inc.* v. *United California Bank, supra,* 21 Cal.3d 671 at pp. 695-696.) "[A]bsent extraordinary and specific facts, a bank does not owe a duty of care to a noncustomer." (*Software Design & Application, Ltd.* v. *Hoefer & Arnett, Inc., supra,* 49 Cal.App.4th at p. 479.) The facts present here are not those extraordinary facts. We thus conclude that neither the Bank nor Soto owed a duty to Karen Kane. Our conclusion is buttressed by the fact that both the Bank and Soto fulfilled their statutory duties.

California Uniform Commercial Code section 4202 sets forth the duties of a collecting bank, the role the Bank filled here: "A collecting bank shall exercise ordinary care in all of the following: [¶] (1) Presenting an item or sending it for presentment. [¶] (2) Sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be. [¶] (3) Settling for an item when the bank receives final settlement. [¶] (4) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof. . . ." The Bank acted in compliance with this statute.

A check cashing service is not a bank, but is an entity which must operate under a permit from the Department of Justice and is subject to regulation under the Civil Code. (Civ. Code, § 1789.30 et seq.) No statute requires a check cashing service to exercise any duty with regard to the maker of a check it cashes.

## II. *Federal law*

Karen Kane also argues that federal currency transaction laws imposed a duty of care on respondents. Specifically, Karen Kane relies on federal regulations which at the relevant time required financial institutions to report currency transactions in amounts greater than $10,000, and to report suspicious transactions, defined as transactions with no business or apparent lawful purpose, involving at least $5,000. (31 C.F.R. §§ 103.21(a), 103.22(a)(1) (1998).) Karen Kane also relies on Evidence Code section 669, which provides that the failure of a person to exercise due care is presumed if the person has violated a statute or regulation, if the injury resulted from an occurrence the nature of which the statute or regulation was designed to prevent, and if the person suffering the injury was one of the class of persons for whose protection the statute or regulation was adopted.

The argument does not establish that the trial court erred. Even if we assume that respondents violated the cited federal regulations, neither anything in the complaint nor anything in the arguments advanced on appeal indicates that the regulations were designed to prevent financial injury to businesses caused by faithless employees, or that such businesses are among the class of persons for whose protection the statute and regulations were enacted, or indeed that Karen Kane suffered any harm as the result of the violation.

To the contrary, the reporting regulations, adopted pursuant to the Bank Secrecy Act, "were designed to provide a sweeping law enforcement tool for locating, *inter alia*, large transfers, in currency, of the proceeds of unlawful transactions," (*United States* v. *Goldberg* (2d Cir. 1985) 756 F.2d 949, 954) and require reports which " 'have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.' (31 U.S.C. § 5311.)" (*Id.* at p. 953.)

## III. *The remaining causes of action**

. . . . . . . . . . . . . . . . . . . . . . . .

*See footnote *ante*, page 1192.

*Disposition*

The judgment is affirmed.

Grignon, Acting P. J., and Godoy Perez, J., concurred.

On December 1, 1998, the opinion was modified to read as printed above.