875 A.2d 1056

VALLEY NATIONAL BANK, PLAINTIFF, v. P.A.Y. CHECK
CASHING, D/B/A UNITED CHECK CASHING, AND
BALWINDER SINGH, DEFENDANTS.

Superior Court of New Jersey
Law Division Passaic County

Decided April 27, 2004.

408

*Patrick J. Spina,* argued the cause for plaintiff (*Sodini & Spina,* attorneys).

*David Wendel,* argued the cause for defendant P.A.Y. Check Cashing, doing business as United Check Cashing.

MINIMAN, J.S.C.

This is an action in which plaintiff Valley National Bank ("Valley National") seeks to recover monies it paid to defendant P.A.Y. Check Cashing, doing business as United Check Cashing ("United Check"), on a $16,000 check issued by Valley National to a natural person payee and a fictitious corporate payee. The check bore a signature and what purported to be a stamped endorsement when it was presented to United Check by the natural person payee and cashed by United Check. The court concludes that Valley National is entitled to recover the full amount of the check despite the existence of a fictitious payee. The facts are undisputed and summary disposition is appropriate.

On April 25, 2002, defendant Balwinder Singh ("Singh") applied to Valley National for a $16,000 loan to purchase a used 1997 BMW 528T, the cash price for which was $22,000. The application was signed on May 9, 2002. In support of the application, Singh supplied an agreement and bill of sale dated April 30, 2002, signed by Singh and by Daniel Tuck on behalf of Belmont Auto Motors, Inc., at 617 Jericho Turnpike, Belmont, New York. The vehicle identification number was WBADD6324W01751 and the total price, including sales tax, was $23,382. Singh also supplied Valley National with a pay stub and his New Jersey driver's license.

Valley National approved the loan and on May 8, 2002, Singh signed an installment loan note and security agreement in which he promised to repay the $16,000 loan with interest at 8.99% over a forty-eight-month period. Valley National issued a $16,000 check payable to Singh and Belmont Auto Motors, Inc., on May 8, 2002. The following day, Singh presented the $16,000 check to United Check, a licensee under the Check Cashers Regulatory Act of 1993, *N.J.S.A.* 17:15A–30 to –52.

United Check promulgated a ten-point list for use by its employees in evaluating checks prior to cashing them. The first point warned employees to be certain that all payees were present and that each had one picture identification and one secondary form of identification. The fifth point queried whether the amount of the check was in line with the person presenting the check. The eighth point required a social security number and instructed employees to ascertain from the number the state in which it had been issued. The ninth point warned employees to have the check signed in their presence, to compare the signature to the identification, and to record the identification on the front of the check. The check list did not provide any specific instructions with respect to checks made payable to business entities.

The back of the check was endorsed by Singh and below his signature was a stamp which read simply "BELMONT AUTO MOTORS, INC." Singh presented a New Jersey driver's license and Mario Payano, the manager of United Check, dialed "Informa-

tion" to obtain a telephone number for Belmont Auto Motors, Inc. He then telephoned Belmont to confirm that it had signed the check. The unidentified person who answered the phone confirmed that it had stamped the check and had authorized Singh to cash the check. United Check then cashed the check and prepared a form 4789 currency transaction report.

The check, deposited on May 9, 2002, was ultimately paid and charged to Valley National's account. When payment on the loan was not timely received from Singh, Valley National discovered that it had never received the title to the vehicle nor perfected a lien. Its investigation revealed that Singh had disappeared, that Belmont Auto Motors, Inc., did not exist, and that Valley National did not have a full VIN and thus could not verify that the vehicle existed either. Its investigation also revealed that at the time of the loan Singh had only $11,623 in total debt; however, as of September 9, 2002, his total debt had ballooned to $204,899.

Valley National concluded that it had been defrauded and authorized the institution of this action against United Check and Singh, who has never been located and served. Valley National described Singh's conduct as "bail out fraud." Inferentially, Valley National was not the only victim of Singh's fraud. Valley National contends that United Check violated *N.J.S.A.* 17:15A–47(a), which provides that no licensee shall

[c]ash a check which is made payable to a payee which is other than a natural person unless the licensee has on file a corporate resolution or other appropriate documentation indicating that the corporation, partnership or other entity has authorized the presentment of a check on its behalf and the federal taxpayer identification number of the corporation, partnership or other entity.

These documentation requirements were not incorporated into United Check's ten-point checklist. In answer to interrogatories, United Check admitted that it did not have on file a corporate resolution or any other documentation indicating that Belmont Auto Motors, Inc., had authorized presentment of the check nor did United Check have on file a federal taxpayer identification

number for Belmont.[1]

Valley National also contends that United Check has breached the Uniform Commercial Code warranties of presentment and transfer. *N.J.S.A.* 12A:3–416, 3–417, 4–207 and 4–208. United Check asserts that it is entitled to the benefit of the fictitious payee defense of *N.J.S.A.* 12A:3–404. Valley National urges that this defense is only available to United Check when it acts in good faith, which it contends is wanting here.

## *The Check Cashers Regulatory Act of 1993*

Needless to say, banking institutions are heavily regulated at the state and federal level. In 1993 the New Jersey Legislature determined that it was appropriate to regulate check cashing businesses and enacted the Check Cashers Regulatory Act. This Act requires all persons engaged in the business of cashing checks for a fee to be licensed by the Commissioner of Banking. *N.J.S.A.* 17:15A:32. In addition to establishing licensing requirements, the Act establishes minimum capital or net worth requirements for check cashing businesses and limits the fees which can be charged for cashing checks. *N.J.S.A.* 17:15A–37, –43. Record keeping duties are imposed upon licensees and annual reports must be filed. *N.J.S.A.* 17:15A–44, –45. In addition to these mandated responsibilities, the Act prohibits licensees from performing certain acts, including the one at issue here. *N.J.S.A.* 17:15A–47.

United Check urges that it cannot be found to have violated *N.J.S.A.* 17:15A–47(a) because Belmont Auto Motors, Inc., was a nonentity, that is, it was not a natural person, corporation, partnership or other business entity. It argues that *fictitious* entities do not come within the scope of the Act, only real business entities do. This argument is fundamentally flawed.

---

[1] This fact distinguishes the case from *Kuhn v. Tumminelli*, 366 *N.J.Super.* 431, 841 *A.2d* 496 (App.Div.2004), which dealt with a corporate resolution alleged to be facially defective and insufficient under the statute. The *Kuhn* court found that the check cashing entity had other appropriate documentation. *Id.* at 444, 841 *A.2d* 496 Here, there is none.

In order to determine whether United Check has violated *N.J.S.A.* 17:15A–47(a), the definitions contained in the Act are illuminating. *N.J.S.A.* 17:15A–31 provides that a " '[n]atural person' does not include a payee identified on the payee line of a check as a partnership, professional association, company, corporation, or other business entity." The Act then provides that "[n]o licensee ... shall cash a check which is made payable to a payee which is other than a natural person unless the licensee has on file a corporate resolution or other appropriate documentation ...." Clearly, "Belmont Auto Motors, Inc." was a payee on the Valley National check which was "identified on the payee line" as a corporation. It is of no moment that Belmont was not actually a corporation. The fact that it was *identified* as such was sufficient to trigger the prohibition of the Act.

Valley National contends that this violation of the Act alone is sufficient to render United Check liable to it for the face amount of the check. The Act, however, does not expressly provide for a private right of action. *N.J.S.A.* 17:15A–49 imposes civil and criminal penalties for violation of the Act and permits the Commissioner to revoke a check casher's license. However, it does provide that "[p]enalties imposed pursuant to this act shall not diminish the remedies which may be available to complainants through private actions." *N.J.S.A.* 17:15A–49(g).

In deciding whether a legislative act gives rise to a private right of action under the act, the New Jersey Supreme Court has adopted the factors established by the United States Supreme Court for testing federal rights of action in *Cort v. Ash,* 422 *U.S.* 66, 95 *S.Ct.* 2080, 45 *L.Ed.*2d 26 (1975). *In re State Comm'n of Investigation,* 108 *N.J.* 35, 41, 527 *A.*2d 851 (1987). Thus, New Jersey courts

> consider[ ] whether the plaintiff is "one of the class for whose *especial* benefit the statute was enacted," whether there is any evidence that the Legislature intended to create a private cause of action under the statute, and whether implication of a private cause of action in th[e] case [before the court] would be "consistent with the underlying purposes of the legislative scheme."
>
> [*Ibid.* (citations omitted).]

The legislative history of the Check Cashers Regulatory Act must be considered. On April 30, 1992, Assembly Bill No. 1323 was introduced by Sponsors Roberts and Penn. Initially, the sponsors proposed to prohibit check cashing businesses from cashing a check if the payee was not a natural person. The Assembly Financial Institutions Committee on May 17, 1993, submitted a Statement to the Assembly on Assembly Bill No. 1323 in which the Committee reported, in part, that the bill had been amended to permit cashing of checks for payees which were not natural persons, but imposed certain record-keeping requirements with respect to such payees.

A more detailed Statement was submitted by the Senate Commerce Committee on November 8, 1993. The Committee stated that the bill required a check cashing business to "set up and maintain a separate record keeping system with respect to checks which are cashed for a payee which is not a natural person, i.e., a corporate or business entity." Specifically, the Committee stated that:

> a licensee is prohibited from: cashing a check which is made payable to a payee which is not a natural person unless the licensee has on file a corporate resolution or other appropriate document indicating that the corporation or other entity has authorized the cashing of checks on its behalf and the federal taxpayer identification number of the corporation or other entity; [or] cashing a check for any one other than the payee of the check . . . .

> [*Senate Commerce Comm. Statement to Assembly,* No. 1323 (1993).]

On January 10, 1994, then Governor James Florio returned Assembly Bill No. 1323 with recommendations for reconsideration. In doing so he commented that:

> This bill would impose a comprehensive system of regulations and oversight on the check-cashing industry. There is no question that this legislation is long overdue. As we have seen from the recent hearings held by the State Commission of Investigation, criminals throughout this State have begun to use check-cashing services as a convenient means of laundering their proceeds. Moreover, check-cashing establishments are more and more becoming the financial institution of choice for many of our citizens in our most economically distressed areas—areas in which banks are sometimes hesitant to locate. The time has therefore come to bring the check-cashing industry into a sensible regulatory mechanism, not only to strengthen our ability to stem money laundering, but to protect the interests of the consumers as well.

*[Governor' Statement to Assembly,* No. 1323 (1994).]

Although the Governor expressed pleasure with the bill, he believed that it should be strengthened in a number of respects, including "more sensible civil and criminal penalties." *Ibid.* He recommended revision of the definition of "customer" to read that " '[c]ustomer' means any person who seeks to have a check cashed by a licensee but does not include the maker of a check payable to another person." *Ibid.* He recommended that a new subsection "n" be added to Section 14 to provide as follows: "Supervise employees engaged in the operation of the check cashing business to ensure the business is conducted lawfully and pursuant to the provisions of this act and any order, rule or regulation made or issued pursuant to this act." *Ibid.* The recommendations of the Governor were accepted and the bill was reenacted on January 10, 1994.

Having examined the legislative history and the statute itself, the court must determine whether Valley National is "one of the class for whose especial benefit the statute was enacted." *In re State Comm'n of Investigation, supra* 108 *N.J.* at 41, 527 *A.*2d 851. Governor Florio clearly viewed the bill as a means to stem money laundering and to protect the interests of consumers. The purpose of the check-cashing provisions in *N.J.S.A.* 17:15A–47(a) is clearly to protect payees identified on the payee line of a check as a partnership, professional association, company, corporation or other business entity from having checks payable to them cashed without their authorization. Valley National is not a payee nor is it a "customer" entitled to certain rights accorded by the Act, such as those found in *N.J.S.A.* 17:15A–47(d). *N.J.S.A.* 17:15A–31 provides that " '[c]ustomer' means any person who seeks to have a check cashed by a licensee *but does not include the maker of a check payable to another person*" (emphasis added). Therefore, the court concludes that Valley National is not one of the class for whose especial benefit the statute was enacted and cannot seek redress directly under that Act. Rather, its rights and remedies are governed by the Uniform Commercial Code.

## The UCC Warranties

Plaintiff alleges that defendant violated the presentment and transfer warranties under the Uniform Commercial Code ("UCC"), specifically, *N.J.S.A.* 12A:3–416, 3–417, 4–207 and 4–208.

Chapter 4 of the U.C.C. governs bank deposits and collections. *N.J.S.A.* 12A:4–101. The threshold issue is whether United Check is a "bank" to which chapter 4 applies. *N.J.S.A.* 12A:4–105(a) defines the term "bank" as meaning "a person engaged in the business of banking, including a savings bank, savings and loan association, credit union, or trust company." Obviously, a "check casher" is not expressly included in the definition of "bank." To decide whether a "check casher" is engaged in "the business of banking," it is fruitful to look at the types of businesses in which banks engage. We begin with the definitions of bank, savings bank, savings and loan association, and credit union found in Title 17.

Pursuant to *N.J.S.A.* 17:9A–1, banks are corporations organized pursuant to specified New Jersey acts and statutes, including *N.J.S.A.* 17:9A–3, to transact business as a bank or trust company, excluding savings banks. A savings bank is a banking institution organized pursuant to specified New Jersey acts and statutes, including *N.J.S.A.* 17:9A–7, –8 or –8.1, to transact business as a savings bank. *N.J.S.A.* 17:9A–1(2) and (13). The powers of banks and savings banks are delineated in *N.J.S.A.* 17:9A–24 and include, among other things, the power to issue cashier's checks, treasurer's checks and money orders; to guarantee signatures and endorsements; to be a member of the Federal Reserve System and the Federal Deposit Insurance Corporation; to make and invest in secondary mortgages and to purchase, hold and invest in mortgages or securities sold by the Federal Home Loan Mortgage Corporation. Banks and savings banks are also empowered to make loans and investments, and to extend credit through the use of credit cards. *N.J.S.A.* 17:9A–24.9. They may also deal in promissory notes, drafts, bills of exchange, mortgages, and other financial vehicles. *N.J.S.A.* 17:9A–25(1). They can issue letters of

credit, receive interest and non-interest bearing demand and time deposits, maintain savings departments for the receipt of interest and non-interest bearing deposits, and make secured and unsecured loans, among other powers. *N.J.S.A.* 17:9A–25. Additional powers are delineated in *N.J.S.A.* 17:9A–25.5 and –26.

The powers granted to savings and loan associations are found in *N.J.S.A.* 17:12B–47 and –48. Although savings and loan associations do not have all of the powers granted to banks and savings banks, they do share a number of those powers. For example, they may insure their members' accounts with the F.D.I.C., borrow money, compute interest on direct reduction loans, accept deposits and issue credit cards. *N.J.S.A.* 17:12B–48. Central credit unions, too, may accept deposits, make loans, establish lines of credit, and buy and sell marketable debt obligations. *N.J.S.A.* 17:13–73.2. Credit unions, likewise, lend funds to their members, purchase conditional sales contracts, and collect, receive and disburse monies in connection with providing negotiable checks and similar instruments. *N.J.S.A.* 17:13–89.

By comparison, the check cashing business is quite narrow in scope, being confined to the cashing of checks. Nevertheless, dealing in negotiable checks *is* part of the business of banking. Check cashing licensees, banks, savings banks, savings and loan associations and credit unions are all subject to regulation and the supervision of the Commissioner of Banking and Insurance. In addition, check-cashing establishments, as the Governor observed, "are more and more becoming the financial institution of choice for many of our citizens in our most economically distressed areas—areas in which banks are sometimes hesitant to locate." [New Jersey governor statement to assembly, No. 1323 (1994)]. Accordingly, the court finds that United Check comes within the definition of a "bank" which is found in *N.J.S.A.* 12A:4–105(a), and thus Chapter 4 of the U.C.C. applies to it and to the negotiation of the check in question. Indeed, United Check did not dispute that it was subject to chapter 4 of the U.C.C. as a person engaged in the business of banking.

In this transaction, United Check was acting as the "depositary bank," which "means the first bank to take an item . . . ." *N.J.S.A.* 12A:4–105(b). It was also a "collecting bank," defined as "a bank handling an item for collection except the payor bank." *N.J.S.A.* 12A:4–105(e). Valley National having issued a check on its own account was both the drawer and the drawee. Thus, it was the "payor bank" as defined by *N.J.S.A.* 12A:4–105(c). No dispute was raised by United Check as to its and Valley National's status.

As a depositary and collecting bank, United Check by transfer warranted to its collecting bank, First Union, that it was entitled to enforce the item and that all signatures on the item were authentic and authorized. *N.J.S.A.* 12A:4–207(a)(1–2).[2] "Subsection (a)(1) is in effect a warranty that there are no unauthorized or missing indorsements that prevent the transferor from making the transferee a person entitled to enforce the instrument." U.C.C. Comment 2 to *N.J.S.A.* 12A:3–416, incorporated by reference in U.C.C. Comment 1 to *N.J.S.A.* 12A:4–207.

Generally, a depositary or collecting bank presenting a check with a forged endorsement to a drawee bank may be held liable for breach of the U.C.C. implied warranty that it had good title under *N.J.S.A.* 12A:4–207. *Clients' Sec. Fund of Bar of N.J. v. Allstate Ins. Co.*, 219 *N.J.Super.* 325, 329–330, 530 *A.*2d 357 (App.Div.1987). They are also liable to all collecting banks on their guaranty of all prior endorsements. *Nutt v. Chem. Bank*, 231 *N.J.Super.* 57, 61, 555 *A.*2d 8 (App.Div.1989). The burden of loss from forged endorsements is thus placed on the bank which accepts the forgery. *Ibid.*

This transfer warranty, however, runs only to collecting banks and not to payor banks. The warranties running to payor banks are the presentment warranties found in *N.J.S.A.* 12A:4–208, which provides:

---

[2] Even if United Check were not a bank subject to Chapter 4 of the U.C.C., it would nonetheless have made the exact same warranties to First Union under *N.J.S.A.* 12A:3–416(a)(1–2) with respect to the check, a negotiable instrument.

(a) If an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, the person obtaining payment or acceptance, at the time of presentment, and a previous transferor of the draft, at the time of transfer, warrant to the drawee that pays or accepts the draft in good faith that:

(1) the warrantor is, or was, at the time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft.

Thus, when First Union presented the check to Valley National as the drawee/payor bank, First Union and United Check warranted to Valley National that they were persons entitled to obtain payment of the check on behalf of the payees. *N.J.S.A.* 12A:4–208(a)(1).[3] This, too, is a warranty that there are no unauthorized or missing endorsements. U.C.C. Comment 2 to *N.J.S.A.* 12A:3–417(a)(1) incorporated by reference in U.C.C. Comment 1 to *N.J.S.A.* 12A:4–208(a). However, there are defenses under *N.J.S.A.* 12A:3–404, –405 and –406 which are available to liability for breach of this presentment warranty that are not available to liability for transfer warranties. *Compare N.J.S.A.* 12A:4–207 with *N.J.S.A.* 12A:4–208(c).

United Check asserts that it is entitled to the protection of *N.J.S.A.* 12A:3–404 which governs instruments, including checks, issued to fictitious payees. Subsection (b) of that statute provides, in pertinent part:

If .. the person identified as payee of an instrument is a fictitious person, the following rules apply until the instrument is negotiated by special indorsement:

. . . .

(2) An indorsement by any person in the name of the payee stated in the instrument is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.

U.C.C. Comment 3 to *N.J.S.A.* 12A:3–404(b) explains the effect of this provision

---

[3] This bank warranty also has an exact corollary in *N.J.S.A.* 12A:3–417(a) with respect to non-bank presenters and transferors. Thus, even if United Check were not a bank, it would have made the precise same warranty to Valley National with respect to the check.

If a check payable to [a] ... fictitious payee ... is paid, the effect of subsection[ ] ... (b) is to place the loss on the drawer of the check rather than on the drawee or the depositary bank that took the check for collection. [F]raud is almost always involved in cases governed by subsection (b). The drawer is in the best position to avoid the fraud and thus should take the loss. ... But in some cases the person taking the check might have detected the fraud and thus have prevented the loss by the exercise of ordinary care. In those cases, if that person failed to exercise ordinary care, it is reasonable that that person bear loss to the extent the failure contributed to the loss. Subsection (d) is intended to reach that result.

As previously noted, it has been stipulated that Valley National's check was issued to a fictitious co-payee, which United Check alleges triggers application of this provision. If so, the stamped endorsement in the name of Belmont Auto Motors, Inc., would be effective as the endorsement of Belmont in favor of United Check which took the check for collection. In order to avail itself of this defense, United Check has the burden to prove that it acted in "good faith" in taking the check for collection.

"Good faith" as now used in *N.J.S.A.* 12A:3–404(b)(2) is defined by *N.J.S.A.* 12A:3–103(a)(4) to mean "honesty in fact *and* the observance of reasonable commercial standards of fair dealing." Prior to New Jersey's adoption in 1995 of the 1990 revisions to the Uniform Commercial Code, there was no standard of care applicable to a party taking an instrument payable to a fictitious payee. *Kraftsman Container Corp. v. United Counties Trust Co.*, 169 *N.J.Super.* 488, 494, 404 *A.*2d 1288 (Law Div.1979). The drawer always bore the loss on the theory that the drawer was in the best position to avoid issuing instruments to fictitious payees.

Formerly, throughout articles 3 and 4 in all instances in which the term "good faith" was used, it was defined by reference to article 1, § 201(19), *i.e.,* "honesty in fact in the conduct of the transaction concerned." 5A–7 Ronald A. Anderson, *Uniform Commercial Code* (3d ed. 1993). In only two instances was a requirement for the observance of reasonable commercial standards imposed in conjunction with the requirement of good faith. 6 *Id.* at 420–21, 6A *Id.* at 102–03.

Former U.C.C. § 3–406 provided:

> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument *in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.*

[6 *Id.,* at 407 (emphasis added).]

And former U.C.C. § 3–419(3) provided:

> Subject to the provisions of this Act concerning restrictive indorsements a representative, including a depositary or collecting bank, who has *in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative* dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

[6A *Id.* at 50 (emphasis added).]

The 1990 revision to the Uniform Commercial Code defined the term "good faith" as used throughout Article 3 to require honesty in fact and the observance of reasonable commercial standards. 6A *Id.* at 481. The revisions also made that expanded definition applicable to all of Article 4. 7 *Id.* at 567. "As originally stated, good faith was a purely subjective element, but the 1990 Revision imposes an objective qualification." 6A *Id.* at 487–88.

■ The burden of proving this defense rests upon United Check. *Bitsko v. Main Pharmacy, Inc.,* 289 *N.J.Super.* 267, 272, 673 *A.*2d 825 (App.Div.1996); *Citizens State Bank v. Nat'l Sur. Corp.,* 199 *Colo.* 497, 612 *P.*2d 70, 71 (1980). In seeking summary judgment, Valley National must demonstrate that the fictitious payee defense is unavailable to United Check as a matter of law. *Bitsko, supra,* 289 *N.J.Super.* at 272, 673 *A.*2d 825. In other words, it must show that no reasonable jury could conclude that United Check acted in good faith. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). Where a claim or defense involves proof of an actor's state of mind, ordinarily summary judgment is inappropriate. *Wilson v. Amerada Hess Corp.,* 168 *N.J.* 236, 253–54, 773 *A.*2d 1121 (2001). However, *N.J.S.A.* 12A:3–103(a)(4) is in the conjunctive, which means that a party asserting the fictitious payee defense must prove that it was

honest in fact *and* that it observed reasonable commercial standards of fair dealing.

Honesty in fact "is determined by looking to the mind of the particular holder." *Gen. Inv. Corp. v. Angelini,* 58 *N.J.* 396, 403, 278 *A.*2d 193 (1971). This is a subjective standard with respect to the particular actor and not a prudent man standard. *Breslin v. N.J. Investors, Inc.,* 70 *N.J.* 466, 471, 361 *A.*2d 1 (1976). The test is neither freedom from negligence nor awareness of circumstances calculated to arouse suspicions. *Joseph v. Lesnevich,* 56 *N.J.Super.* 340, 348, 153 *A.*2d 349 (App.Div.1959), *overruled in part on other grounds, O'Keeffe v. Snyder,* 83 *N.J.* 478, 499, 416 *A.*2d 862 (1980). Although there are facts here which would support a conclusion that United Check was not honest in fact,[4] such a conclusion is reserved for the trier of fact. However, no showing of intent is required with respect to the second prong of "good faith" under *N.J.S.A.* 12A:3–103(a)(4). In construing the double-prong standard for good faith, the Kansas Supreme Court held that when a bank receiving deposits has not acted according to reasonable commercial standards, it is not necessary to determine whether it had acted honestly. *Mohr v. State Bank of Stanley,* 241 *Kan.* 42, 734 *P.*2d 1071, 1078 (1987). The issue then becomes whether United Check as a matter of law failed to act in accordance with reasonable commercial standards applicable to the business of banking and, in particular, to check cashing licensees.

---

[4] Bad faith may be evidenced by conduct so irregular in nature that the bank is shown to have violated its own policies and to have failed to act according to the standard of honesty-in-fact which is required under the Code. *Kraftsman Container Corp., v. United Counties Trust Co.,* 169 *N.J.Super.* 488, 404 *A.*2d 1288 (Law Div.1979). An extreme violation of reasonable commercial standards may justify, and even, compel a finding of bad faith. *Board of Higher Educ. of City of N.Y. v. Bankers Trust Co.,* 86 Misc.2d 560, 383 *N.Y.S.*2d 508 (Sup.Ct.1976). So, too, might extreme negligence show a lack of good faith. These cases, however, were decided prior to the revisions to the Uniform Commercial Code and reaching this issue is no longer necessary in light of the current requirement for the observance of reasonable commercial standards.

Although no case in New Jersey has yet specifically construed the two-prong test for good faith formulated in *N.J.S.A.* 12A:3–103, it should be interpreted in accordance with prior cases construing U.C.C. § 3–406 and § 3–419(3). "[T]he issue of whether a bank has acted in a commercially reasonable manner is generally a question of fact ...." *Central, Inc., v. Cache Nat'l. Bank,* 748 *P.*2d 351, 353 (Colo.Ct.App.1987). However, there are instances "where the circumstances demonstrate, as a matter of law, that the bank did not comply with reasonable commercial standards," holding that when a bank is tendered checks payable to a corporation for deposit in an individual account, a duty of inquiry arises and when no inquiry is made, the bank fails to act in accordance with reasonable commercial standards as a matter of law. *Id.* at 353–354. *Accord Mohr, supra,* 734 *P.*2d at 1078.

Three New Jersey cases have been found in which summary judgment was granted on the issue of the failure to comply with reasonable commercial standards.[5] The first case to have done so was *Salsman v. Nat'l Cmty. Bank of Rutherford,* 102 *N.J.Super.* 482, 246 *A.*2d 162 (Law Div.1968), *aff'd* 105 *N.J.Super.* 164, 251 *A.*2d 460 (App.Div.1969). Applying *N.J.S.A.* 12A:3–419(3) to the facts before it, the court in a bench trial on stipulations, depositions, affidavits and admissions held that the defendant bank did not act in accordance with reasonable commercial standards when it accepted a check for deposit into an account other than one for the payee estate. 102 *N.J.Super.* at 493, 246 *A.*2d 162. Also, on two occasions in 1995 the Appellate Division held that summary judgment was properly granted against defendant banks on the ground that they had violated reasonable commercial standards as

---

[5] The grant of summary judgment to the depositary bank was affirmed in *Knesz v. Cent. Jersey Bank & Trust Co. of Freehold,* 97 *N.J.* 1, 8–9, 477 *A.*2d 806 (1984). There, the Supreme Court held that when a check bearing a prior forged endorsement was properly endorsed by the holder, a customer of the bank, and deposited into the holder's account, the depositary bank as a matter of law conformed to reasonable commercial standards and was protected from liability to the payee whose endorsement had been forged pursuant to *N.J.S.A.* 12A:3–419(a)(3).

a matter of law. In the first, *Martin Glennon, Inc. v. First Fidelity Bank, N.A.*, 279 *N.J.Super.* 48, 57, 652 *A.*2d 199 (App. Div.), *appeal dismissed.* 142 *N.J.* 510, 665 *A.*2d 1104 (1995), the bank permitted the deposit of a check payable to a corporation into an individual account. The Appellate Division held that "reasonable commercial standards in such a case are defined by law, and there is a series of cases in New Jersey clearly stating that it is negligent for a bank to permit the deposit of a check payable to a corporation into an individual account." *Ibid.* It concluded that the bank's action was in clear violation of established law and could not be found to have conformed to reasonable commercial standards. *Ibid.* Finally, in *Mandelbaum v. P & D Printing Corp.*, 279 *N.J.Super.* 427, 435, 652 *A.*2d 1266 (App.Div. 1995), in affirming summary judgment to plaintiff and against defendant bank, the court held that

> a depositary bank that accepts and forwards for collection without notice or reservation a draft that fails to contain required endorsements, has not acted in a commercially reasonable manner and has breached its presentment warranties, and is therefore not protected by *N.J.S.A.* 12A:3–419(3).

A number of other jurisdictions have found that similar conduct by banks constituted a failure to act in compliance with reasonable commercial standards as a matter of law. For example, the Michigan Court of Appeals held that it is entirely proper for a trial court to take judicial notice of a lack of compliance with reasonable commercial standards when a bank makes no inquiry respecting the propriety of an individual negotiating a check payable to a corporate payee which was stamped with a rubber endorsement. *Sherriff–Goslin Co. v. Cawood*, 91 *Mich.App.* 204, 283 *N.W.*2d 691, 694 (1979). In *Empire Moving & Warehouse Corp. v. Hyde Park Bank & Trust, Co.* 43 *Ill.App.*3d 991, 2 *Ill.Dec.* 753, 357 *N.E.*2d 1196, 1201 (1976), it was undisputed that a corporate resolution on file at the drawee bank precluded negotiation of checks drawn or negotiated on the corporate general account unless the checks had two signatures of specified individuals. It was also undisputed that cashing corporate checks rather than depositing them into the corporate account was an unusual departure for normal practices.

Accordingly, the Illinois Court of Appeals held that the drawee bank failed to act in accordance with reasonable commercial standards.

Like New Jersey, the District of Columbia Court of Appeals has held that when a bank accepts a check to a corporate payee for deposit into an individual account, it has, as a matter of law, failed to act in accordance with reasonable commercial standards. *Am. Mach. Tool Distrib, Ass'n v. Nat'l Permanent Fed. Sav. & Loan Ass'n*, 464 A.2d 907, 913–915 (D.C.1983). New York also has found that negotiation of a corporate two-party check in the absence of a signature guaranty as to the non-customer co-payee "is a patent indication of the absence of good faith and adherence to reasonable acceptable commercial banking standards" supporting judgment as a matter of law in favor of the defrauded co-payee. *Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski v. Questex Corp.*, 159 *Misc.*2d 126, 603 *N.Y.S.*2d 111, 114 (N.Y.CityCiv.Ct.1993), *affirmed per curiam*, 160 *Misc.*2d 244, 613 *N.Y.S.*2d 109 (N.Y.Sup.App.Term.1994).

■■■ Indisputably, United Check violated the Check Cashers Regulatory Act, which establishes reasonable commercial standards for check cashing licensees, in several ways. First, it cashed a check payable to a corporation without having a corporate resolution or other appropriate documentation indicating that the presentment was authorized. *N.J.S.A.* 17:15A–47(a). It also did not have a federal taxpayer identification number for the corporation. *Id.* In addition, it failed to comply with *N.J.S.A.* 17:15A–44(n), which required it to supervise employees "to ensure the business is conducted lawfully and pursuant to the provisions of this act . . . ." The violation of this provision is clearly evidenced by United Check's ten-point checklist which did not require its employees to comply with the documentation requirements of *N.J.S.A.* 17:15A–47(a). Having so violated the Act, United Check became subject to a potential revocation or suspension of its license under *N.J.S.A.* 17:15A–48(a)(1). In addition, the violation

of *N.J.S.A.* 17:15A–47(a) could have resulted in the imposition of a civil penalty up to $5,000. *N.J.S.A.* 17:15A–49(b)(2).

Furthermore, United Check violated established law when it took a check payable to a corporate co-payee and cashed it for the individual co-payee. *See, e.g., Morgan, Melhuish, supra,* 159 *Misc.*2d 126, 603 *N.Y.S.*2d 111. It is not normal business practice for a corporate payee of checks to endorse them and deliver to others in the absence of an appropriate reason and pursuant to appropriate corporation authorization. *Belmar Trucking Corp. v. Am. Trust Co.,* 65 *Misc.*2d 31, 316 *N.Y.S.*2d 247, 251 (N.Y.City-Civ.Ct.1970).

In addition, United Check violated its own internal, albeit insufficient, guidelines for cashing checks. Its manager did not make certain that all payees were present with identification. The amount of the check was at least arguable not in line with the person presenting the check, because bank checks payable to a car dealership and an individual are generally for the purpose of buying a car. No taxpayer identification number was secured for Belmont Auto Motors, Inc., and Belmont did not endorse the check in the presence of United Check. A bank's failure to follow its own internal policies and procedures is unreasonable. *Lund v. Chem. Bank,* 797 *F.Supp.* 259, 270 (S.D.N.Y.1992). The same rule applies to check cashing licensees.

United Check also urges that Valley National violated its duty under *N.J.S.A.* 12A:4–406 by failing to give timely notice of its claim. Subsection (c) of § 4–406 provides:

> If a bank sends or makes available a statement of account or items pursuant to subsection a. of this section, the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

Of course, Valley National is both the bank and the customer and it would hardly seem that any duty could exist in such a situation. Even if it did, the customer's breach of this duty only operates as

a bar to the customer's action against its payee/drawee bank. *N.J.S.A.* 12A:4–406(d). Furthermore, in this case the item was not altered, nor was Valley National's signature unauthorized. Thus, this statutory provision has no application to the facts before the court.

As a consequence of United Check's failure to comply with the Check Cashers Regulatory Act and its own internal policies, the court concludes that United Check violated the presentment warranties contained in the Uniform Commercial Code as a matter of law. Valley National urges that subsection (c) of *N.J.S.A.* 12A:4–207 governing transfer warranties entitles it to recover the face amount of the check plus interest and expenses. However, those transfer warranties do not govern this issue because Valley National is neither a "transferee or subsequent collection bank" for whose benefit the warranties are extended. *N.J.S.A.* 12A:4–207(a). This is so because under *N.J.S.A.* 12A:3–203(a) an instrument "is transferred when it is delivered by a person other than the issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." No right to enforce the instrument was transferred to Valley National, rather it was presented for payment. Rather, Valley National's right to relief arises under the presentment warranties of *N.J.S.A.* 12A:4–208(a)(1) which were breached by United Check. Subsection (b) of *N.J.S.A.* 12A:4–208 allows the drawee to recover the amount paid by the drawee (less the amount the drawee is entitled to receive from the drawer) plus expenses and loss of interest resulting from the breach of warranty. This provision entitles Valley National to recover the face amount of the check—$16,000. In addition, neither party has urged that a rate of interest other than that provided by *R.* 4:42–11 should be applied. Interest under that rule from May 9, 2002, to the date of this opinion totals $1,838.12.[6] This leaves only the question of "expenses" under *N.J.S.A.* 12A:4–208(b).

---

[6] In 2002 that statutory rate of interest was 8%. For the 237 days of 2002 during which interest is awarded, the total amount of interest is $831.12 for

U.C.C. Comment 1 to § 4–208 provides that it conforms to § 3–417 and that the substance of § 4–208 is discussed in § 3–417. U.C.C. Comment 5 to the latter section is reproduced in its entirety below:

> The measure of damages for breach of warranty under subsection (a) is stated in subsection (b). There is no express provision for attorney's fees, but attorney's fees are not meant to be necessarily excluded. They could be granted because they fit within the language "expenses . . . resulting from the breach." Subsection (b) provides that the right of the drawee to recover for breach of warranty is not affected by a failure of the drawee to exercise ordinary care in paying the draft. This provision follows the result reached under former Article 3 in *Hartford Accident & Indemnity Co. v. First Pennsylvania Bank,* 859 *F.*2d 295 (3d Cir.1988). [*N.J.S.A.* 12A:3–417, U.C.C. Comment 5.]

In discussing the extent of liability under § 3–417, Anderson observed that "[i]n addition to the recovery above described, the plaintiff will be allowed to recover costs, attorney's fees, and other incidental expenses as authorized by the paper sued upon or *by the practice of the forum,*" citing § 1–103. 6A *Anderson, Supra,* at 33 (emphasis added).

 Valley National candidly admits that its research has failed to reveal any published opinions in New Jersey that speak to the issue of counsel fees in such a situation. On the other hand, United Check has not raised a dispute about an award of fees.

 Despite the absence of such a dispute, the Third Circuit has concluded under New Jersey law that attorney's fees are not recoverable for breach of UCC warranties. *McAdam v. Dean Witter Reynolds, Inc.,* 896 *F.*2d 750, 775 (3rd Cir.1990). The court looked to the history of attorney's fees in New Jersey, noting that New Jersey now strictly adheres to the "American rule" whereby "the prevailing litigant is ordinarily not entitled to collect reasonable attorney's fees from the loser." *Ibid.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 *U.S.* 240, 247, 95 *S.Ct.* 1612, 1616, 44 *L.Ed.*2d 141 (1975)). *See Van Horn v. City of*

---

2002. The 2003 rate of interest was 5% and thus interest for that year totals $800. In 2004 the rate of interest is 4% and amount of interest through the date of this opinion is $206.90.

*Trenton,* 80 *N.J.* 528, 538, 404 *A.2d* 615 (1979). The court also noted the few specific exceptions to the general rule contained in *R.* 4:42–9, supporting the view that "sound judicial administration will best be advanced by having each litigant bear his own counsel fee." *McAdam, supra,* 896 *F.*2d. at 775 (quoting *Gerhardt v. Continental Ins. Cos.,* 48 *N.J.* 291, 301, 225 *A.2d* 328 (1966)). In order to maintain the application of the general rule, attorney's fees should not be awarded absent express authorization by statute, court rule, or contract. *McAdam, supra,* 896 *F.*2d at 775. The court concluded that the "vague reference" in *N.J.S.A.* § 4–207(c) to "expenses" was an insufficient basis to conclude that the statute expressly authorized an award of attorney's fees contrary to the general rule. *McAdam, supra,* 896 *F.*2d at 776. The court was equally unimpressed by UCC comment 5 as a sufficient indicia of the Legislature's intent. *Ibid.*

This court is persuaded by the soundness of the opinion rendered by the Third Circuit in *McAdam,* and is equally convinced that if the Legislature had meant to include an award of attorney's fees under the UCC presentment and transfer warranties, it would have done so explicitly. Accordingly, the application for an award of counsel fees is denied. The court has entered final judgment, a copy of which is being transmitted with this opinion.