SIXTH DIVISION

                                             February 11, 1999

No. 1-97-3984

THE FIRST NATIONAL BANK OF CHICAGO,

A National Banking Association,

Plaintiff-Appellee,

v.

MIDAMERICA FEDERAL SAVINGS BANK,

A National Banking Association,

Defendant-Appellant.

)

)

)

)

)

) )

)

)

)

)

Appeal from the Circuit Court of Cook County

Honorable 

David Lichtenstein,

Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, The First National Bank of Chicago (First Chicago), filed a complaint against defendant MidAmerica Federal Savings Bank (MidAmerica), claiming breach of certain warranties pursuant to the Illinois version of the Uniform Commercial Code-Negotiable Instruments (810 ILCS 5/3-101  
et
 
seq
. (West 1996)) and seeking a judgment in the amount of $157,611.30.  Both First Chicago and MidAmerica filed motions for summary judgment.  The trial court granted summary judgment in favor of First Chicago and entered a money judgment in its favor in the amount of $157,611.30 plus interest and costs.  On appeal, MidAmerica contends that the trial 

court erred in granting summary judgment in favor of First Chicago because: (1) there was a genuine issue of material fact as to whether MidAmerica breached certain presentment warranties; (2) MidAmerica had a valid defense pursuant to section 3-404 of the Illinois version of the Uniform Commercial Code (UCC); and (3) MidAmerica had a valid defense pursuant to section 3-406 of the UCC.  

For the following reasons, we affirm the judgment of the circuit court.

The following facts are undisputed.  Prior to June 21, 1995, First Chicago mailed a maturity notice to its customer Muhamad Mustafa, at his home in Naperville, Illinois, informing him that his certificate of deposit was coming to maturity.  The maturity notice allows a First Chicago customer to make a written election with respect to the handling of the certificate of deposit.  Once the customer has made the election on the maturity notice form, the customer is required to return the form to First Chicago.  The maturity notice form also includes a signature area that must be signed by the First Chicago customer in order to close the account.  The form was returned to First Chicago with instructions to close the certificate of deposit account, apparently signed by Muhammad Mustafa. 

On June 21, 1995, after receiving the maturity notice form, First Chicago issued a cashier's check in the amount of $157,611.30, payable to Muhamad S. Mustafa.  First Chicago mailed the cashier's check to Muhamad Mustafa's address in Naperville via first class mail.  

On or about June 26, 1995, Michael Mustafa deposited the check into his account at MidAmerica.  Michael Mustafa was a MidAmerica customer at the time and shared the same residential address as Muhamad Mustafa.  Michael Mustafa is also the nephew of Muhamad Mustafa.  When the check was deposited into Michael Mustafa's MidAmerica account, the purported signature of Muhamad Mustafa and the signature of Michael Mustafa both appeared on the reverse side of the check.

First Chicago paid the check on or about June 27, 1995.  Approximately 10 days later, Michael Mustafa withdrew the funds from his MidAmerica account representing substantially all of the check proceeds.  In the middle of July 1995, Michael Mustafa telephoned First Chicago and informed it that he had forged the signature of Muhamad Mustafa, taken the cash and lost it gambling at a riverboat casino.  

On August 14, 1995, Muhamad Mustafa went to the First Chicago branch in Naperville, Illinois, to redeem the certificate of deposit.  First Chicago informed Muhamad Mustafa that a cashier's check was already issued and that the account was closed.  Muhamad Mustafa stated that he was out of the country at the time the cashier's check was issued.  First Chicago then prepared and obtained Muhamad Mustafa's signature on a forged indorsement affidavit and issued a replacement check to him for the full amount.       

First Chicago filed suit against MidAmerica alleging that MidAmerica breached certain warranties and was liable to First Chicago for $157,611.30.  MidAmerica filed a third-party complaint against Michael Mustafa, alleging that he endorsed the check knowing that he was not authorized to do so and intended that MidAmerica rely on his endorsement to honor and pay the check.   

The following deposition testimony was taken.  Aida Rivera,

assistant vice president and transaction processing unit manager for First Chicago, testified that her responsibilities included insuring that all mail transactions to First Chicago were processed accurately on all retail accounts.  Rivera stated that the first time she became aware of Muhamad Mustafa was when she received a telephone call from the risk control department, which is responsible for investigating any errors or fraudulent transactions.  The risk control department requested documentation of the cashier's check issued to Muhamad Mustafa and any instructions Muhamad Mustafa gave First Chicago regarding his account. 

Rivera pulled the file and found the maturity notice and a copy of the cashier's check issued to Muhamad Mustafa.  Rivera testified that there was a handwritten portion on the maturity notice that said "close account and mail check to my home address."  Rivera assumed that the customer, Muhamad Mustafa,  wrote that instruction.  

Rivera testified that once the customer returns the maturity notice form to First Chicago, the signature on the notice is verified.  Signature verification involves taking the purported signature on the notice and comparing it with a digitized signature on file at First Chicago.  Rivera testified that bank employees are trained to compare and verify the signatures.  Rivera also testified that First Chicago further checks its system to insure that no holds, restraints or alerts were placed on the account.  Once everything is verified, the check is issued.  First Chicago then conducts another verification to insure that the address that the check is being mailed to is exactly as the title reads, and the check is mailed to the customer. 

Rivera testified that she questioned Kim Fraser regarding whether she followed the proper procedures in verifying Muhamad Mustafa's signature.  Fraser told Rivera that she verified the signature on the maturity notice using the digitized system.  

Deposition testimony was also taken from Kathie Thorne, branch president at First Chicago.  Thorne testified that the first time she became aware of Muhamad Mustafa was on August 14, 1995, when he came into the bank to redeem his certificate of deposit.  Thorne is  not normally involved in this process but became involved because the funds had been withdrawn from his account.  Thorne investigated the situation and discovered whom the check was made payable to and when it was released.  Thorne discovered that the check was issued on June 21, 1995, and spoke with Aida Rivera, whose department issued the check.  Thorne testified that Rivera told her that a phone call had been made to the phone unit of the bank, asking that the check be released and mailed to the statement address and that the phone caller had explained that he had been in receipt of the maturity notice and wanted the funds released to him at the statement address.  Thorne could not determine which employee spoke with the caller. 

MidAmerica filed a petition for rule to show cause against Muhamad Mustafa for failure to comply with the subpoena for deposition served upon him.

Following the filing of First Chicago's suit against MidAmerica, MidAmerica obtained a default judgment against Michael Mustafa in the amount of $157,611.30 in addition to $200,000 in punitive damages and $12,000 in attorney fees.  Michael Mustafa also pleaded guilty to a federal crime arising out of this incident.  

Both First Chicago and MidAmerica filed motions for summary judgment.  The trial court granted summary judgment in favor of First Chicago.  MidAmerica's timely appeal followed.

Initially, we note that a reviewing court conducts a 
de
 
novo
 review of the evidence in summary judgment cases.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995).  The reviewing court must construe all evidence strictly against the movant and liberally in favor of the nonmoving party.  
Espinoza
, 165 Ill. 2d at 113.  Where the pleadings, depositions and affidavits show that there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law.  
First of America Trust v. First Illini Bancorp, Inc.
, 289 Ill. App. 3d 276, 283 (1997).  If reasonable persons could draw different inferences from undisputed facts, summary judgment should be denied.  
Smith v. Armor Plus Co.
, 248 Ill. App. 3d 831, 839, 617 N.E.2d 1346 (1993). 

MidAmerica argues that the trial court erred in granting summary judgment in favor of First Chicago because First Chicago has not demonstrated that MidAmerica breached any presentment warranties.  First Chicago responds that it clearly established a 
prima
 
facie
 case of breach of warranty under sections 3-417 and 4-

208 of the UCC.

Sections 3-417 and 4-208 provide in pertinent part:  

"(a) If an unaccepted draft is presented to

the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the person obtaining payment or acceptance, at the time of presentment, and (ii) a previous transferor of the draft, at the time of transfer, warrant to the drawee making payment or accepting the draft in good faith that:

(1) the warrantor is or was, at the

time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft;

(2) the draft has not been altered;

and

(3) the warrantor has no knowledge

that the signature of the purported drawer of the draft is unauthorized." 810 ILCS 5/3-

417(a), 4-208(a) (West 1996). 

Each section further provides at subsection (c) as follows:

"(c) If a drawee asserts a claim for breach of

warranty under subsection (a) based on an unauthorized indorsement of the draft or an alteration of the draft, the warrantor may defend by proving that the indorsement is effective under Section 3-404 or 3-405 or the drawer is precluded under Section 3-406 or 4-406 from asserting against the drawee the unauthorized indorsement or alteration."  810 ILCS 5/3-417(c), 4-208(c) (West 1996).

Under subsection (a), a bank that accepts and pays a check with an unauthorized or forged indorsement warrants to subsequent transferees the validity of that indorsement and may be held liable on that warranty.  
Vectra Bank v. Bank Western
, 890 P.2d 259, 262 (Colo. App. 1995).  The purpose of the warranty is to place on the bank taking an instrument from a person making an unauthorized indorsement the responsibility of collecting from that person.  As explained in 
Federal Deposit Insurance Corp. v. Marine National Bank
, 303 F. Supp. 401 (M.D. Fla. 1969), the reason for imposing the warranty is to:

" speed up the collection and transfer of 

checks and to take the burden off each bank to meticulously check the endorsements of each item transferred.  Following that logic, the first bank taking in the item for collection is primarily responsible for checking the endorsements to make sure that they are proper.  Each bank then warrants to each subsequent bank in the collection chain that the endorsements are good.  Of course, the original bank has rights over against the person originally presenting the item.

The rationale suggested puts the burden

directly upon the first bank in the collection chain to make sure that the endorsements are valid.  This is reasonable because the first bank is in a better position to insure that it is taking the item from someone with good title than are subsequent banks in the chain.  If the rationale is to facilitate the speedy transfer and collection of items by removing the burden on each bank to inspect and verify each endorsement, subsequent banks are not negligent if they do not thoroughly inspect each item.  In other words, the warranty feature of the statute is designed to remove the duty of each bank to check the endorsements, and, therefore, [the plaintiff bank] would not be negligent to fail to so inspect."  
Federal Deposit Insurance Corp.
, 303 F. Supp. at 403.

The rule recognizes that, while none of the parties may have had reason to suspect a fraud, the one who took from the forger was the closest to the person causing the loss and is presumed to have had the best opportunity to have prevented the loss.  
Dominion Bank, N.A.  v. Household Bank, F.S.B.
, 827 F. Supp. 463, 466 (S.D. Ohio 1993).

In the instant case, the record establishes that the indorsement on the cashier's check issued to Muhamad Mustafa was unauthorized and ineffective.   MidAmerica, as the first bank in the collection chain, had a responsibility to ensure that the indorsement was valid, and through acceptance and payment of the check, MidAmerica warranted that the indorsement was valid.  As this indorsement was in fact, invalid, we hold that MidAmerica breached it presentment warranty to First Chicago under sections 3-

417(a) and 4-208(a) of the UCC.   

MidAmerica next argues that it has a defense pursuant to section 3-404 of the UCC 810 ILCS 5/3-404 (West 1996).  MidAmerica asserts that First Chicago's claim for breach of warranty under sections 3-417(a) and 4-208(a) of the UCC is invalid because the indorsement is effective under the imposter defense.  The imposter defense provides as follows:

"(a) If an imposter, by use of the mails or

otherwise, induces the issuer of an instrument to issue the instrument to the imposter, or to a person acting in concert with the imposter, by impersonating the payee of the instrument or a person authorized to act for the payee, an indorsement of the instrument by any person in the name of the payee is effective as the indorsement of the payee in favor of the person who in good faith, pays the instrument or takes it for value or for collection."

810 ILCS 5/3-404 (West 1996).

In the instant case, the record establishes that MidAmerica did not present any evidence that Michael Mustafa, the forger, impersonated Muhamad Mustafa.  Furthermore, the imposter defense requires that the imposter induce the issuer of the instrument to issue the instrument to the imposter.  Here, there is no evidence that Michael Mustafa induced First Chicago to deliver the cashier's check to him.  First Chicago merely issued the cashier's check to Muhamad Mustafa by mail.  Therefore, we hold that the imposter defense is not applicable.  See 
Greenberg v. A&D Motor Sales, Inc.
, 341 Ill. App. 85, 89-91, 93 N.E.2d 90 (1950).

MidAmerica further argues that it has a defense under section 3-406 of the UCC (810 ILCS 5/3-406 (West 1996)) because First Chicago's failure to exercise ordinary care substantially contributed to the making of the forged signature on the check.  MidAmerica specifically asserts that First Chicago failed to exercise ordinary care in verifying the signature of Muhamad Mustafa, which substantially contributed to the making of the forged check that was delivered to MidAmerica.  First Chicago responds that MidAmerica presented no evidence that First Chicago was negligent in the issuance of the check.

Section 3-406 provides in pertinent part:

"(a) A person whose failure to exercise

ordinary care substantially contributes to an alteration of an instrument or to the making of  a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection."  810 ILCS 5/3-406 (West 1996).

In 
Chicago Heights Currency Exchange, Inc. v. Par Steel Products & Service Co.
, 123 Ill. App. 3d 1054, 463 N.E.2d 829 (1984), one of the defendants was the general manager of Par Steel Products and was authorized to sign checks on the company checking account.  After his employment with the company was terminated and his authority to sign company checks was cancelled, the defendant signed and delivered two checks drawn on the company account.  The plaintiff currency exchange, which had prior dealings with Par Steel checks, cashed the checks.  When the two checks were presented to the drawee bank for payment, they were returned marked unpaid.  The plaintiff brought an action against the defendant and Par Steel, alleging that Par Steel's failure to notify the plaintiff that the defendant's authority to sign checks had been withdrawn and that defendant possessed checks that he could no longer sign constituted negligence.  
Chicago Heights Currency Exchange
, 123 Ill. App. 3d at 1054-55.  Par Steel asserted section 3-406 of the UCC as a defense.  This court held that the evidence in the record did not establish that Par Steel's actions constituted negligence that substantially contributed to the making of the unauthorized signatures.  
Chicago Heights Currency Exchange
, 123 Ill. App. 3d at 1055.  In holding as such, this court stated the following:

"'[T]he meaning of section 3-406 is best reflected

by precluding a drawer from recovery under these or similar circumstances only where his negligent conduct contributes to the forgery, not merely to the unwarranted issuance of the checks ***.'" [Emphasis omitted.] 
Chicago Heights Currency Exchange
, 123 Ill. App. 3d at 1056, quoting 
Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
, 491 F.2d 192, 197 (8th Cir. 1974). 

In the instant case, First Chicago's issuance of the cashier's check to Muhamad Mustafa did not cause or induce MidAmerica to accept and pay on the fraudulently indorsed check and therefore was not the proximate cause of the improper payment of the check.  Rivera testified that First Chicago has specific and detailed procedures for signature and address verification prior to the issuance of a cashier's check to a customer.  Rivera further stated that Kim Fraser, the First Chicago employee who handled Muhamad Mustafa's maturity notice form, followed all necessary procedures in the issuance of the cashier's check to him. Thus, we find as a matter of law that First Chicago's issuance of the cashier's check did not substantially contribute to MidAmerica's improper payment of the check and First Chicago's conduct does not abrogate MidAmerica's liability under section 3-417 or 4-208 of the UCC.

Finally, First Chicago requests that this court award it reasonable attorney fees incurred in defending this appeal because MidAmerica's basis for bringing this appeal lacks any factual or legal support.  Supreme Court Rule 375(b) provides that if the court determines that an appeal is frivolous, or that it is not taken in good faith, it may impose an appropriate sanction, including reasonable attorney fees.  155 Ill. 2d R. 375(b).  If under an objective standard of conduct a reasonably prudent attorney in good faith could have brought the appeal, a request for sanctions will be denied.  
Ben Franklin Financial Corp. v. Davis
, 226 Ill. App. 3d 414, 421-22, 589 N.E.2d 857 (1992).

In the instant case, we deny First Chicago's motion for sanctions on appeal.   In light of the fact that there is little Illinois authority on the issue of unauthorized indorsement and the use of the imposter defense, there is no evidence to suggest that MidAmerica's appeal was not brought in good faith.  See 
Alcantar v. Peoples Gas Light & Coke Co.
, 288 Ill. App. 3d 644, 651, 681 N.E. 2d 993 (1997).

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and ZWICK, JJ., concur.