Filed 11/6/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HH COMPUTER SYSTEMS, INC., | |
| Plaintiff and Appellant, | G049028 |
| v. | (Super. Ct. No. 30-2013-00637522) |
| PACIFIC CITY BANK et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Derek W. Hunt, Judge. Reversed.

Russo & Duckworth and J. Scott Russo for Plaintiff and Appellant.

Kim, Park, Choi & Yi, Tony K. Kim and John K. Park for Defendant and Respondent Pacific City Bank.

Prenovost, Normandin, Bergh & Dawe, Steven L. Bergh and Nichole M. Wong for Defendant and Respondent US Metro Bank.

David A. McDonnell for Defendant and Respondent Wilshire State Bank.

\*        \*        \*

## I. INTRODUCTION

This case about stolen checks and check cashing services presents a distressingly common scenario: An employee of a corporation with responsibility to gather incoming checks made payable to the corporation and deposit those checks into the corporation's bank account – in this case, the corporation's accounting manager – steals some of the incoming checks and takes them to a check cashing service where she forges the signature of one of the officers of the corporation and receives hard cash in return. (See Cook, *Robbed by Your Employees* (Feb. 2013) Orange County Lawyer p. 28 [noting risk that accounting managers with access to incoming checks may "grab the check" and "run down to a check cashing service"] (hereafter Cook Article on Check Theft).) Naturally, after discovery of the thefts, the corporation fires the accounting manager and tries to recoup at least some of its losses. In this case, the corporation's recoupment effort includes suing its own bank, the three check cashing services where the employee took the checks, *and* the three banks which received those checks from the check cashing services for deposit into those companies' own accounts.

But while the scenario is common, the legal issue presented in this appeal is one of first impression in California: Does the interposition of the check cashing services (often called check cashing companies) between (a) the employee who stole the checks and (b) the three banks who took the checks from three check cashing companies and credited the accounts of those check cashing companies, relieve the banks of all duty of care under section 3405 of California's Commercial Code?[1]

We conclude the answer is no. In this case the three banks were the *first banks* to process the checks through the banking system, and, as "first banks," they had a duty of care in the processing of those checks "'to make certain all endorsements are valid; banks subsequently taking the paper have a right to rely on the forwarding bank.'"

___
[1] All statutory references in this opinion to the Commercial Code unless otherwise indicated.

(See *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 685, quoting *Feldman Const. Co. v. Union Bank* (1972) 28 Cal.App.3d 731, 736.) Check cashing companies are not banks, and should not be treated as banks for purposes of California's Uniform Commercial Code. We therefore reverse the judgment of dismissal entered on behalf of the three banks after they successfully demurred without leave to amend in the trial court. (The three check cashing companies themselves are not part of this appeal.)

## II. FACTS

This appeal arises out of a judgment entered after a demurrer by three banks to the plaintiff's second amended complaint was sustained without leave to amend. The three banks are US Metro Bank, Wilshire State Bank, and Pacific City Bank. We will refer to them in this opinion as the "three conventional banks" to emphasize the distinction between "conventional" banking institutions and check cashing services. We take our statement of facts from that second amended complaint.

The plaintiff is HH Computer Systems, Inc., a California corporation. HH is in the business of salvaging computer parts. In the years 2011 and 2012, HH employed Jennifer Kim as an accounting manager. Her duties included sending out the bills to HH's customers, receiving delivery of checks, entering the receipt of those checks into HH's accounting software, and then depositing the checks into HH's account at Hanmi Bank.[2] For a period of about a year and a half, January 2011 through July 2012, Kim took approximately 300 checks payable to HH to one of three check cashing companies, Oksun USA, MH Brothers, or DDK Express. There, she endorsed them with some sort of illegible scrawl, a scrawl which bears no resemblance to the signatures of the only two officers of HH authorized to sign checks. Moreover, HH never authorized any document which could lead anyone to reasonably believe Kim had authority to sign checks on its

---

[2] While Hanmi Bank is a named defendant in this action, it is not one of the three conventional banks involved in this appeal. As the three conventional banks point out, HH is a customer of Hanmi Bank, but the same cannot be said of any of them.

3

behalf. The check cashing companies then deposited the checks into their own accounts (or otherwise cashed them) at their own banks. Oksun deposited (or otherwise cashed) the checks it received into its own accounts at Hanmi Bank, US Metro Bank, or Wilshire State Bank. MH Brothers did the same at US Metro Bank. And DDK Express deposited the checks it received from Kim into its own account at Pacific City Bank (or otherwise cashed them).

The second amended complaint alleges that each of these three conventional banks did not exercise ordinary care in allowing the checks coming from the check cashing companies to be deposited or cashed. HH says they should have known better than to credit any check made payable to a corporation or a business to any account other than that corporation or business's own account, at least without demanding a guarantee from the bank where the corporation or business holds a deposit account.

HH discovered the theft of checks payable to it sometime in December 2012. It appears that some $650,000 was stolen. (HH's monthly revenue from checks made payable to it amounts to "hundreds of thousands of dollars.") Kim was terminated, and the matter was referred to the Santa Ana police. HH filed this suit in March 2013. In its second amended complaint it alleged a cause of action for statutory negligence under section 3405 against all defendant banks.

The three conventional banks demurred to the second amended complaint. They styled themselves as *non*-depositary[3] banks, who were only processing checks that had "already been negotiated" by their check-cashing service customers, and contended they had no duty to HH, who was not a customer of any of them. The trial court agreed,

---

[3]     The law in this area is riddled with spelling anomalies. Depository, depositary – endorse, indorse – insure, assure. We use "deposit*ary*" in this case to avoid confusion because the statute spells it that way.

4

and sustained the demurrers without leave to amend.[4]  HH appealed within days of the ensuing judgment of dismissal.  On appeal, HH presents arguments pertaining only to its claim against the three conventional banks for statutory negligence under section 3405.  It makes no claims for either common law negligence or conversion.[5]

## III.  DISCUSSION

A. *Overview*

The law of what is often called "negotiable instruments" can be intimidating.  Because it involves a number of – at least for non-specialists – hard-to-follow terms of art, some introduction to the peculiar nomenclature is necessary.  An excellent and mercifully readable introduction to the area is found in the Cook Article on Check Theft, and, rather than try to improve on it with our own paraphrase, we will set it out now verbatim:

"Here is a 50-cent primer on *negotiable instruments*, which is a fancy word for checks.  These are the players and their titles.  The person who signs the check is the *maker*.  The person to whom the check is written is the *payee*.  The person upon whose account the check is drawn is the *drawer*, and the bank who would pay the check is called the *drawee*.  The person who endorses the check, no surprise, is the *endorser*.  An *endorsement* is the signature of the payee on the reverse side of the check.  The amount of the check is the *tender*.  *A holder in due course* is the person who receives the check for deposit, cashing (bank or check cashing service), or takes the check for value, in good

---

[4]     The ensuing minute order did not provide an explanation as to the precise nature of the trial court's reasoning.  However, in oral argument the trial judge alluded to the three conventional banks' argument when he asked HH's counsel "When did your client suffer the loss," indicating his analysis was that the loss was complete when the check cashing companies gave Kim money for the stolen checks.

[5]     The "big case" from our California Supreme Court in the areas of banking and negotiable instruments is *Sun 'n Sand, supra*, 21 Cal.3d 671.  *Sun 'n Sand* centered on a claim for common law negligence against a bank involving a scam by an employee who altered checks written in small amounts payable to the bank itself, and had the enlarged amounts of those checks credited to her own account at the bank.  After the 1992 revisions to California's Commercial Code, courts have recognized a common law negligence action no longer exists in California.  (See *Lee Newman, M.D., Inc. v. Wells Fargo Bank* (2001) 87 Cal.App.4th 73, 79.)  But that doesn't mean *Sun 'n Sand* is irrelevant to our analysis here.  Its observations on the way the banking system is supposed to run are particularly important.

5

faith, and without notice of any irregularity.  A check that clears is *honored*, and a check that bounces is *dishonored*.  The person getting stuck with the bounced check is *very angry* and will *sue*."  (Cook Article on Check Theft, *supra*, at p. 28.)

A nice description of how these definitions fit within the check circulation process was found and reproduced by the court in *Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 881, fn. 10:  "'A few basic concepts are useful to facilitate the discussion.  A check typically involves three parties, (1) the "drawer" who writes the check, (2) the "payee", to whose order the check is made out, and (3) the "drawee" or "payor bank", the bank which has the drawer's checking account from which the check is to be paid.  In form, a check is an order to the drawee bank to pay the face amount of the check to the payee.  After receiving the check, the payee typically indorses it on the back in the payee's own name, and then deposits it in the payee's account in a different bank, the "depositary bank".  The depositary bank credits the check to the payee's account, and sends the check through the check clearing system to the payor bank for ultimate payment from the drawer's account.  Any bank through which the check passes in the clearing process is an "intermediary bank".  Any bank handling the check for collection, including the depositary bank but excluding the payor bank, is referred to as a "collecting bank."'"  (Quoting *In re McMullen Oil Co.* (Bankr. C.D.Cal. 2000) 251 B.R. 558, 566-567.)

This case centers on the problem of whether check cashing services are "banks," but, unfortunately for our purposes, we can find no non-circular definition of a "bank" in the Commercial Code.  The code gives the exact same definition, not just once, but twice.  (§§ 1201, subd. (4) and 4105, subd. (1).)  That definition is:  "'Bank' means a person engaged in the business of banking, and includes a savings bank, savings and loan association, credit union, and trust company."

Section 4105 then goes on to list no less than five different *types* of banks (depositary, payor, intermediary, collecting and presenting) and these definitions can clearly overlap.[6] (See *Lee Newman, supra*, 87 Cal.App.4th at p. 76, fn. 3, quoting § 4105, subd. (5) ["Regardless whether it is also the payor bank, the first bank to which a check is submitted for collection is called the 'depositary bank.' . . . In this process any bank handling the check for collection, including the depositary bank but excluding the payor bank, is referred to as a 'collecting bank.'"].)

B. *The Special Role of the "First Bank"*

While a depositary bank may also be a collecting bank, there is an important difference when a collecting bank is *not* a depositary bank. The depositary, or "first bank" to process a check in the check clearing system, bears a special role. Almost 50 years ago, a federal judge explained the special role of the first bank in the context of discussing warranties imposed by section 4207 on various handlers of checks up the banking chain. His point was there is a reason for those warranties. It is "to speed up the collection and transfer of checks and to the take the burden off each bank to meticulously check the endorsements of each item transferred." (*Federal Deposit Ins. Corp. v. Marine Nat'l Bank* (M.D. Fla. 1969) 303 F.Supp. 401, 403.) This language would be quoted with approval by our state high court about nine years later in *Sun 'n Sand, supra*, 21 Cal.3d at page 685. The judge went on to say that "the first bank taking in the item for collection is

---

6    Section 4105 provides:
"In this division:
"(1) 'Bank' means a person engaged in the business of banking, including a savings bank, savings and loan association, credit union, or trust company.
"(2) 'Depositary bank' means the first bank to take an item even though it is also the payor bank, unless the item is presented for immediate payment over the counter.
"(3) 'Payor bank' means a bank that is the drawee of a draft.
"(4) 'Intermediary bank' means a bank to which an item is transferred in course of collection except the depositary or payor bank.
"(5) 'Collecting bank' means a bank handling an item for collection except the payor bank.
"(6) 'Presenting bank' means a bank presenting an item except a payor bank."

7

primarily responsible for checking the endorsements to make sure they are proper," and thus there is a "burden directly upon the collection chain to make sure that the endorsements are valid." (*Federal Deposit Ins. Corp., supra*, 303 F.Supp. at p. 403.)

Three years later, a California appellate court made the same point in *Feldman Constr. Co. v. Union Bank* (1972) 28 Cal.App.3d 731, 736, a case arising out of a scenario in which the first bank failed to ascertain that a check made out to two parties (there a subcontractor and a materialman) actually needed the signatures of both parties, not just that of the subcontractor who then stiffed the materialman. Construing section 4207, the *Feldman* court observed: "The theory is that the first bank in the chain has a duty to make certain all endorsements are valid; banks subsequently taking the paper have a right to rely on the forwarding bank." (*Feldman, supra,* 28 Cal.App.3d at p. 736.) This language too was later quoted with approval in *Sun 'n Sand, supra*.

These principles were directly applied in *Lee Newman, M.D., Inc. v. Wells Fargo Bank, supra,* 87 Cal.App.4th 73, which held that a *depositary* bank can indeed be sued under section 3405 if it fails to exercise due care in the processing of a check. In *Newman*, in a parallel to the case at hand, a bookkeeper-office manager working in a doctor's office, with the help of an assistant office manager, stole incoming checks. The two employees, together with a third person (a non-employee confederate) were then able to fraudulently endorse them and either cash them or deposit them into their personal bank accounts. (*Lee Newman, supra*, 87 Cal.App.4th at p. 76.)

The sequence in *Newman* was: steal the checks payable to the employer, forge the endorsements on the checks payable to the employer, then take them to one's own bank for deposit or cash. The bookkeeper, office manager and confederate were "permitted by Wells Fargo to cash the checks or deposit the funds into their respective personal bank accounts," despite such indicia of fraud as sloppy writing on business checks and personal endorsements on large checks from insurance companies. (*Lee Newman, supra*, 87 Cal.App.4th at p. 76.) Thus, as the court styled Wells Fargo Bank in

8

the opinion, "Wells Fargo thus acted as a 'depositary' and 'collecting' bank, but not a 'payor bank,' within the meaning of the Commercial Code." (*Ibid*.) As the first bank in the chain, Wells Fargo was thus liable under section 3405 for any comparative negligence on its part: "To the extent Newman can prove that Wells Fargo failed to exercise ordinary care and can further prove that such lack of care contributed to the loss, Newman may recover from Wells Fargo pursuant to section 3405 to the extent that bank's failure contributed to the loss." (*Id*. at pp. 83-84.)

Out-of-state cases follow the same first bank rule. (See *First Nat'l Bank v. MidAmerica Fed. Sav. Bank* (1999) 303 Ill.App.3d 176, 181-182 ["a bank that accepts and pays a check with an unauthorized or forged indorsement warrants to subsequent transferees the validity of that indorsement and may be held liable on that warranty"]; *Vectra Bank v. Bank W.* (Colo.App. 1995) 890 P.2d 259, 262 ["The purpose of the warranty is to place on the bank taking an instrument from a person making an unauthorized endorsement the responsibility of collecting from that person."].) As the Illinois appellate court wrote in *First. Nat'l., supra,* the underlying rationale for the "burden" put "directly upon the first bank in the collection chain" is "to make sure that the endorsements are valid." The simple fact is that "the first bank is in a better position to insure that it is taking the item from someone with good title than are subsequent banks in the chain." (*First Nat'l, supra*, 303 Ill.App.3d at p. 182.)

The reason we emphasize the significance of the first bank doctrine is the nature of the argument made by the three conventional banks here. They contend they weren't the *first banks* in the chain. That role, they tell us in this appeal, is really that of the check cashing companies. Instead, the three conventional banks style themselves as mere secondary banks, up the chain in collection, who, a la *Sun 'n Sand* and *Feldman*, had a right to rely on the check cashing companies as de facto first banks.

To be sure, check cashing companies can *feel* like banks in a loose sense of the word. A customer takes a check written on someone's account at a bank and gets

9

money for it.  Real banks do that all the time.  But so do liquor stores and markets and desperate landlords.  We acknowledge that the role of check cashing companies in the general American economy has grown tremendously over the past 20 or so years.  They facilitate financial services for large numbers of people who are not now connected to traditional banking institutions,[7] and treating them as "banks" would be consistent with the general bank deregulation of the late 1990's which broadened the list of institutions who, in effect, could act as banks.[8]

Nonetheless, we are convinced check cashing companies are not *banks* for purposes of section 3405.[9]  There are two main reasons we conclude that even though a stolen check comes to a bank from a check cashing company the bank still may be liable under section 3405.

First, *statutorily*, the UCC definitions of various kinds of banks set out in section 4105 focus on the bank collection process itself.  (See generally *Edward D. Jones & Co. v. Mishler* (1999) 161 Ore.App. 544, 555-556 [noting the role of bank collection process is the "overarching concern" of the UCC's definition of banking].)  Section 4105 generally categorizes different types of banks by their role in the chain of collection, including the first bank to receive a check (depositary banks), those banks which are

---

[7]  See *Roman Check Cashing v. N.J. Dep't of Banking & Ins.* (2001) 169 N.J. 105, 114-115, quoting *Liao v. New York State Banking Dep't* (1989) 74 N.Y.2d 505, 549 [noting report by state investigatory commission to the effect that "'privately operated check cashing businesses serve a vital social and economic function for a significant segment of the population" that either does not or cannot "maintain contact with regular banking institutions'"]; see also *Tze Chun Liao v. New York State Banking Dept.* (1989) 74 N.Y.2d 505, 507-508 ["Due to dramatic lessening of personal consumer services at traditional banking institutions, licensed check cashing outlets have emerged as significant servicing businesses, especially in urban neighborhoods throughout New York City. Residents of these areas have been left with little choice but to resort to these multipurposed commercial shops for their primary monetary transactions, such as cashing their paychecks, income maintenance checks, food stamp checks; for payment of utility bills; and for purchasing money orders."].

[8]  See Baradaran, *Banking and the Social Contract* (2014) 89 Notre Dame L. Rev. 1283, 1306 ["This deregulation reflected an underlying shift in thinking about banks."]; Felton, *Too Big to Manage:  The Case for Stricter Bank Merger Regulation* (2012) 52 Santa Clara L. Rev. 1081, 1091 ["Deregulation of banks, combined with overall market globalization, altered the nature of banking.  Commercial banks merged with investment companies and invested in capital markets, taking full advantage of their privileges."].

[9]  They might, of course, be *persons* for purposes of section 3405 liability – but that's a topic we need not reach here.

ultimately responsible to pay the check (payor banks) and banks in between (intermediary and collecting banks). The code's focus on the collection process is strongly suggestive that check cashing companies are not "banks," because by definition no check cashing service will ever be a *payor* bank – check cashing companies don't give their customers checking accounts. And when section 4105 is read in tandem with the definition of "check casher" in our Civil Code, a definition which specifically says that within the set of check cashers there are no banks, the conclusion becomes ineluctable that check cashers do not qualify as any kind of *bank* under the Commercial Code. (See Civ. Code, § 1789.3 ["'Check casher' does not include a state or federally chartered bank, savings association, credit union, or industrial loan company."].)

And, two, *functionally*, check cashing companies are not banks. Check cashing companies are not *depositary* institutions. Taking deposits is fundamental to the "business of banking." (See *Edward D. Jones, supra*, 161 Ore.App. at pp. 555-556 [concluding securities broker was indeed bank because money market checking account was in essence a depositary account]; *Gutierrez v. Wells Fargo Bank* (9th Cir. 2012) 704 F.3d 712, 723 ["key powers of national banks include the authority to receive deposits"]; *Bank of Am. v. City & County of S.F.* (9th Cir. 2002) 309 F.3d 551, 563 ["Both the 'business of banking' and the power to 'receiv[e] deposits' necessarily include the power to post transactions – i.e., tally deposits and withdrawals – to determine the balance in the customer's account."].) Moreover, the examples of banks given in the 2006 UCC revision to section 1201 – "a savings bank, savings and loan association, credit union, and trust company" – are all institutions that take money on deposit, including the one example that seems least like a real bank – a "trust company." If a trust company does anything, it *holds money* for other people. (See *Bank of America National Trust & Savings Assn. v. Board of Supervisors* (1949) 93 Cal.App.2d 75, 81 [citing provision of old Bank Act to the effect that "the business of acting as agent or escrow holder is considered the business of a trust company"]; see also Prob. Code, § 83.) Under the rule

11

of *ejusdem generis*, an entity like a check casher which doesn't hold money for other entities would seem to fall outside the definition of banks suggested by this list.

One does not *deposit* money into a check cashing company. In fact, the main point of check cashing companies for most of their customers (notwithstanding embezzlers like Kim) is that they don't need an account at a real bank in order to obtain cash from checks, which are usually payroll checks or government benefit checks.[10] Moreover, traditional banks don't take a cut of *every* check deposited from every customer. In California, customers may receive as little as 88 cents on the dollar from check cashers.[11]

The three conventional banks rely exclusively on *Karen Kane, Inc. v. Bank of America* (1998) 67 Cal.App.4th 1192 for their argument. But *Karen Kane* – as we explain in detail below – was concerned exclusively with a claim of *common law* negligence against both a check casher and a bank, and so does not shed light on the question of whether the fact a check comes from a check casher and is presented to a check casher's own bank somehow *relieves* that bank of its duty of care under the first bank rule.

We are aware of only one case in the nation which might, even arguably, support the three conventional banks' position that the check cashing companies here are de facto first banks. That case is a decision from New Jersey Superior Court's Law Division in *Valley Nat. Bank v. P.A.Y. Check Cashing* (2004) 378 N.J. Super. 406.[12] The case arose out of a loan scam. The plaintiff bank approved a $16,000 loan to the

---

[10]     Professor Barr of the University of Michigan cites data from one national check casher to the effect that payroll and government benefit checks together make up 96 percent of its business. (See Barr, *An Inclusive, Progressive National Savings and Financial Services Policy* (2007) 1 Harv. L. & Pol'y Rev. 161, 163.)

[11]     Civil Code section 1789.35 establishes a schedule of fees for check cashing services in California. Basically, there's a three-dollar limit on payroll or government checks (see subd. (a)) and the limit for personal checks of 12 percent (subd. (d)).

[12]     New Jersey's Superior Court Law Division is a one-judge trial level court, which, like federal district courts, can write publishable written decisions. New Jersey's true intermediate appellate court is the New Jersey Superior Court Appellate Division.

12

purported customer of a purported car dealer, and issued a check for $16,000 to the customer and the car dealer. The purported customer took the check to a check cashing company. The customer then signed the check and also had it stamped with the name of the purported car dealer. The check cashing company presented the check to the plaintiff bank, who paid the check cashing company. Then the plaintiff bank learned, to its chagrin, that the car dealer didn't exist, and the customer was in the process of running up a large amount of debt. (See *id*. at p. 411.) The plaintiff bank sued the check casher along with the customer. In the process of discussing the UCC warranties that might run from the check casher to the plaintiff bank, the *Valley National* court opined the check cashing company "was acting as the 'depositary bank,' which 'means the first bank to take an item . . . .' [Citation.]" (*Id*. at p. 418.) The court recognized that the check cashing business is "quite narrow in scope," but reasoned that "dealing in negotiable checks *is* part of the business of banking." (*Id*. at p. 417.) The court further mentioned the state governor's comment that check cashing companies are the "'financial institution of choice for many of our citizens in our most economically distressed areas'" and declared its finding the check cashing company was within the definition of bank under New Jersey's equivalent of UCC section 4105. (*Ibid.*)

We do not find the *Valley National* opinion to be persuasive insofar as it might arguably be applied in the case before us. First, the observation was dicta. The court observed that the same result – a warranty running from the check cashing company to the plaintiff bank – would exist even if the check cashing company were not a bank. (*Valley Nat., supra*, 378 N.J. Super. at p. 418, fn. 2.) Second, the observation was made without a party actually opposing it: Neither the plaintiff bank nor the check cashing company disputed the check cashing company's "status." (*Id*. at p. 418.) Third, the court did not address the essentially *depositary* nature of the banking business, and instead

13

reasoned that engaging in an activity that is "part" of the business of banking was enough. (*Id*. at p. 417.)[13]

Definitions have consequences. We conclude the check cashing companies in this case are *not* depositary first banks. Ergo, the three conventional banks who took checks from those check cashing companies are first banks and therefore, under *Newman*, subject to the duty of care provided for in section 3405.[14]

C. *Section 3405*

The key text on which this appeal depends is section 3405, which we set out in the margin.[15] Section 3405 starts with the idea that the loss occasioned by an

---

[13] That, we think, is too broad; it reduces to absurdity quickly. The coworker who picks up the tab at lunch and then is reimbursed in the afternoon may be making a loan of sorts, and loans are certainly *part* of the business of banking, but that doesn't make the coworker a bank under the UCC.

[14] We deliberately do not adopt a possible *third* reason to say check cashers are not banks, namely that because check cashers work under a different regulatory structure than banks, they aren't banks for purposes of the Uniform Commercial Code. We recognize that the sole published California decision to even mention the issue said precisely that. (See *Karen Kane, supra*, 67 Cal.App.4th at p. 1203 ["A check cashing service is not a bank, but is an entity which must operate under a permit from the Department of Justice and is subject to regulation under the Civil Code."])

The reason we do not adopt *Karen Kane's* observation – to repeat, *Karen Kane* is a common law negligence case and not a section 3405 case – is that we do not want to decide a case *not* before us. Specifically, there are several out-of-state cases which hold that large investment firms like the old Merrill Lynch which allow their clients to have money market checking accounts *are* banks, even though such firms are under a different regulatory structure (in their case, securities law) than banks. (See *Edward Jones & Co. v. Mishler, supra,* 161 Ore.App. 544, 560-561; *Lichtenstein v. Kidder, Peabody & Co., Inc.* (W.D. Pa. 1989) 727 F.Supp. 975, 978, vacated on other grounds *Lichtenstein v. Kidder, Peabody & Co., Inc.*, 777 F.Supp. 423; *Asian International v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (La.App. 1983) 435 So.2d 1058, 1062.) This is not to say we necessarily disagree (or agree) with *Karen Kane's* observation – it's just to say we choose not to preempt the California court that may eventually have to decide whether a large brokerage house that issues money market checking accounts is a bank or not.

[15] California Commercial Code section 3405 is identical to UCC section 3405. Here is the text:
"(a) In this section:
"(1) 'Employee' includes an independent contractor and employee of an independent contractor retained by the employer.
"(2) 'Fraudulent indorsement' means (A) in the case of an instrument payable to the employer, a forged indorsement purporting to be that of the employer, or (B) in the case of an instrument with respect to which the employer is the issuer, a forged indorsement purporting to be that of the person identified as payee.

embezzling employee entrusted with responsibility for checks is placed on the employer, not the bank. But, as the *Newman* court pointed out, section 3405 establishes no conclusive presumption. Its orientation is *tempered* by the possibility of negligence on the part of the bank: "This loss allocation principle, however, is tempered by the doctrine of comparative negligence: Section 3405, subdivision (b) provides that, if the party paying the instrument or taking it for collection 'fails to exercise ordinary care in paying or taking the instrument and that failure contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.'" (*Lee Newman, supra*, 87 Cal.App.4th at p. 83.)

But what is ordinary care in the section 3405 context? In the case before us, HH has alleged that standard banking practice is to refuse to deposit a check made payable to a corporation or a business into anything other than the corporation's or business's own account, at least without first obtaining an endorsement guarantee. In fact, the second amended complaint alleges that such standard practice is part of the defendant banks' own policies.

---

"(3) "Responsibility" with respect to instruments means authority (A) to sign or indorse instruments on behalf of the employer, (B) to process instruments received by the employer for bookkeeping purposes, for deposit to an account, or for other disposition, (C) to prepare or process instruments for issue in the name of the employer, (D) to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer, (E) to control the disposition of instruments to be issued in the name of the employer, or (F) to act otherwise with respect to instruments in a responsible capacity. "Responsibility" does not include authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access.

"(b) For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

"(c) Under subdivision (b), an indorsement is made in the name of the person to whom an instrument is payable if (1) it is made in a name substantially similar to the name of that person or (2) the instrument, whether or not indorsed, is deposited in a depositary bank to an account in a name substantially similar to the name of that person."

15

In addition, the case involves other indicia of fraud, not the least of which was that the first stop of the checks presented to the three conventional – and, now, as we have established, *depositary* – banks were various check cashing companies, which were happy to give the embezzler Kim large amounts of cash based on, as far as the facts known on demurrer are concerned, nothing more than her illegible scrawl, an obvious red flag.[16]

We think that is enough. *Karen Kane*, on which the three conventional banks rely, is distinguishable, both on the ground (a) it wasn't a section 3405 case at all and (b) the scam was different. There are two basic kinds of employee schemes to embezzle with checks.[17] The case before us is the intercept-a-valid-check-payable-to-the-employer kind. *Karen Kane* involved the other basic kind of employee fraud, in which employees manipulate the employer's check writing apparatus to have otherwise legitimate checks made out so the employees can divert the money to themselves.[18]

In *Karen Kane*, the manager of a clothing company's trim department arranged for over 70 checks to be made out to six fictitious payees. He took the checks to a check cashing company, who over three years gave him a large amount of cash, or in some instances overseas wire-transfers, totaling some $760,000, and in turn the check cashing company deposited the checks into its account at Bank of America. (*Karen Kane, supra*, 67 Cal.App.4th at p. 1196.) When the clothing company found out about it, it sued both the check cashing company and the bank for *common law* negligence. (See

---

16　　In *Karen Kane*, one of the proffered indicia of fraud was the negotiation for cash at a check cashing service. (See *Karen Kane, supra*, 67 Cal.App.4th at p. 1198.) But a central point of the case was that there was nothing in the checks that would have alerted either a bank or check cashing service to the "possibility of internal fraud." (*Id*. at p. 1199.) That cannot be said here, where no reason appears (at least at this point in the litigation) why some 300 checks written to the same business should be negotiated at check cashing services, incurring, in the process, relatively high transactional costs.

17　　See Cook Article on Check Theft, *supra*, at page 28, discussing the specific possibility of theft of checks incoming into a law office. ("The risk for these checks is that the employee will grab the check, endorse the payee-attorney's name on the check and deposit the check in the employee's account.")

18　　See Cook Article on Check Theft, *supra*, at pages 29-30 [detailing "'padded payroll'" and "'dummy invoice'" schemes].

16

*id.* at p. 1197.) The comparative negligence principle embodied in section 3405 was not mentioned – indeed, section 3405 does not appear in the opinion.[19] As to common law negligence, the *Karen Kane* court held that neither the check cashing company nor the bank had violated its duty of care as a matter of common law negligence, relying primarily on the traditional factors bearing on tort law duty as spelled out in *Rowland v. Christian* (1968) 69 Cal.2d 108. Those factors include foreseeability of harm, closeness of the connection between the defendant's conduct and the injury, moral blame, policy of preventing future harm, and general costs of imposing a duty, including whether that cost can be covered by insurance. (See *Karen Kane, supra*, 67 Cal.App.4th at p. 1197.) Applying the *Rowland* factors, the *Karen Kane* court concluded that, taken in the aggregate, there was no duty of inquiry on either the check casher's or the bank's part. (*Id.* at p. 1200.) The *Karen Kane* court was particularly persuaded by the lack of outward red flags associated with the checks involved *combined with the fact that it was the defrauded business who actually issued them*. It pointed out the "checks were business-to-business checks, were regular on their face," and the business "had firsthand knowledge of the amount and frequency of the checks." (*Id.* at p. 1198.) Moreover, there was simply nothing on the check to suggest any *internal fraud in the generation of the checks*, a fact the court contrasted with the situation where a payee's check is simply stolen and forged. (*Ibid.*)

Thus, the fraudulent check scheme in *Karen Kane* did not involve transparently suspicious scrawls on checks made payable to a corporation or a business, but *printed* checks with "genuine signatures." (*Karen Kane, supra*, at p. 1194.) And, by

---

[19]    On reflection, there is an obvious reason no claim for statutory negligence was made. The employee in *Karen Kane* probably would not have qualified as a responsible employee under subdivision (a)(3) of the statute, and such a status is necessary before section 3405 can be invoked in the first place. The embezzling employee was a purchasing manager responsible for things like buttons and ribbon, and to implement his fraud he had to go through the accounts payable department, and the opinion gives no indication the accounts department (who might indeed be responsible persons under subdivision (a)) was in on his scheme. (See *Karen Kane, supra*, 67 Cal.App.4th at pp. 1195-1196.)

17

the same token, one of the opinion's major themes in the context of its *Rowland* factor analysis was that as a business, the clothing manufacturer was in a position to "police its own financial practices" (*id*. at p. 1199). Accordingly – apropos the case before us now – the *Karen Kane* court hastened to distinguish its facts from "a case where a payee claims that as a result of a forged or improper endorsement it did not receive the proceeds of a check." (*Id*. at p. 1198.) *Karen Kane* thus certainly cannot be read for the proposition that the facts alleged in the second amended complaint here – facts it explicitly declined to address – are insufficient to show a lack of due care by the three conventional banks.

Two matters remain to be addressed in regard to the duty of care of the three conventional banks under section 3405. First, *Karen Kane* observed that the clothing company was not the customer of the bank and had no pre-existing relationship with either the check cashing company or the bank. (See *Karen Kane, supra*, 67 Cal.App.4th at p. 1199.) The three conventional banks use that observation to argue for a bright-line rule that they aren't responsible to any entity not their customer. But the observation was made in the context of the court's efforts to divine whether a common law duty of care could be established under the *Rowland* factors. It was but one of a host of factors analyzed to arrive at a conclusion of no-duty as a matter of *common law negligence*. The case at hand, rather, involves a statutory negligence claim under section 3405, which was the subject of the *Lee Newman* opinion, not the *Karen Kane* opinion. And, as HH points out, it made no difference in *Lee Newman* that the doctor also had no pre-existing relationship with Wells Fargo Bank.

And finally we recapitulate what we do and do not conclude. We *do* hold, following *Lee Newman*, that a first-level depositary bank is included within the ambit of ordinary care envisaged by section 3405, even if check cashing companies get between the fraudulent employee and the first-level depositary bank. On the other hand, we most certainly do *not* hold that a "collecting" or "intermediary" bank that is not *also* a

18

depositary bank is within the ambit of ordinary care envisaged by section 3405.[20] *Sun 'n Sand*, in fact, indicates a collecting, but non-depositary bank has a lesser duty of care than a depository bank.  Further, we express no opinion as to any liability under section 3405 on the part of the check cashing companies in this case.  They do not appear in this appeal and have not filed friend of the court briefs, so we have no occasion to comment on their liability.

D. *Causation and Damages*

One of the ideas proffered by the trial judge in sustaining the demurrers of the three conventional banks was that the true "loss" sustained by HH was not actually caused by the three conventional banks, because HH's loss was "complete" when Kim successfully stole the various checks payable to HH and got cash for them at one of the three check cashing companies.  That idea has been reiterated in the banks' briefs and surfaced again at oral argument before this court.

The idea, however, is not persuasive.  But it is more persuasive as an inchoate impression than as an argument.  If the three conventional banks had not accepted checks *from the customers of HH* for deposit into the check cashing companies' own accounts – that is, if the "first banks" in the collection chain had turned away the fraud when it reached their door – then the payor banks on which the checks from the customers of HH had been drawn would not have debited the accounts of those customers.  HH customers' money would have remained in their checking accounts, still available for them to presumably send replacement checks to HH at such point as HH discovered the thefts.

---

[20]     *Lee Newman* described the first bank in that case, Wells Fargo, as both a "depositary" and "collecting" bank.  (See *Lee Newman, supra*, 87 Cal.App.4th at p. 76.)  But it would be error to jump to the conclusion that the *Lee Newman* court was pegging potential section 3405 liability on Wells Fargo if it had been only a collecting bank and not also a depositary bank.  Wells Fargo, under the facts of *Lee Newman*, was both a depositary and a collecting bank, and so the description was perfectly accurate.

To be sure, HH's laxity in discovering the fraud must count against it in any scheme of comparative negligence under section 3405. The trial judge was quite correct to note HH was in the best position to prevent the loss. But this case comes to us on demurrer, and we cannot say, as a matter of law at this stage of the proceedings, that the three conventional banks bear zero percent of the fault for the loss.

E. *No Dire Consequences*

A major theme of the briefing of the three conventional banks is the disruption attendant on the imposition of a duty of care regarding the possibility of forged checks. As defendant US Metro Bank writes, "If US Metro Bank were required to perform such an extensive investigation on every check it received for deposit after having been negotiated by someone else, there is no way a bank would stay in business."

We are surprised to hear that banks are operating on such tenuous footing. And the argument seems to us flawed in other respects. The argument assumes the three conventional banks are nothing more than secondary collecting banks, and that liability under section 3405 attaches to collecting banks. Not so. They are first-level depositary banks, not "collecting banks" who do not also occupy the status of depositary banks. As we have tried to stress in this opinion, the reason for the "first bank" rule is to take the pressure off subsequent (i.e., non-depositary) banks to examine each check as it comes through. (See *Sun 'n Sand, Inc. v. United California Bank, supra,* 21 Cal.3d at p. 685; *Feldman Constr. Co. v. Union Bank, supra,* 28 Cal.App.3d at p. 736; and *Federal Deposit Ins. Corp., supra*, 303 F.Supp. at p. 403.)[21]

In fact, our decision articulates no more of a burden even on *first banks* than they already have. That burden is a light one: (a) It only affects first banks which have check cashing companies as customers, and even then it only applies (b) to those

---

[21] We are acutely aware that the three check cashing companies are not before us. And they are certainly not in privity with the three conventional banks. So we have been careful to try to avoid saying anything in this opinion which might prejudice their rights.

checks presented by check cashing companies to their own banks which are made out to a business or corporation. Those checks appear to represent a tiny percentage of something less than four percent of check cashing companies' total business.[22] And even as to *that* tiny percentage, check cashers and their banks can protect themselves by the simple expedient of the check casher obtaining a written authorization from any business or corporation to whom a check is payable that the business or corporation has authorized a given individual to sign checks on its behalf. (See, e.g., *Kuhn v. Tumminelli* (2004) 366 N.J. Super. 431, 443-444 [discussing level of documentation which might establish business's authorization].) In a word, today's decision will not require even depositary banks to hire armies of employees to examine each check like something out of Harry Potter's Gringotts. It will require only a minimal level of reasonable care.

These three banks are, at least for the moment, still in the case and may be subject to section 3405's rule of comparative liability.


## IV.  DISPOSITION

The judgment of dismissal in favor of the three conventional banks, US Metro Bank, Pacific City Bank, and Wilshire State Bank as to HH's cause of action for section 3405 negligence is reversed. However, we are mindful of the essence of section 3405, which only makes first level banks liable under a *comparative* negligence analysis.

---

[22]  See Barr, *An Inclusive, Progressive, National Savings and Financial Services Policy, supra*, 1 Harv. L. & Pol'y Rev. at page 163.

21

Because the case comes to us on demurrer, we cannot know how the various levels of comparative negligence will eventually play out, particularly as between HH and the three conventional banks. So our decision today is essentially interlocutory. As such, the trial court will have discretion, at the end of the case, to allocate the appellate costs incurred in this proceeding, as between the four parties before us, as justice requires.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.